No. 31,208

R. W. Sage and H. R. Boughner, *Appellees,* v. The Oil Country Specialties Manufacturing Company, *Appellant.*

(27 P. 2d 542.)

Opinion filed December 9, 1933.

*Dallas W. Knapp, Charles D. Welch,* both of Coffeyville, and *Austin M. Cowan,* of Wichita, for the appellant.

*Charles G. Yankey, Harvey C. Osborne, J. G. Sears, Jr.,* and *Verne M. Laing,* all of Wichita, for the appellees.

The opinion of the court was delivered by

Smith, J.: This is an action to recover money and for an accounting. Judgment was for plaintiffs, ordering an accounting. Defendant appeals.

The petition states two causes of action. The first alleges that plaintiffs were the inventors of a "new and useful improvement in

chain-driven sand reels." It alleges that plaintiffs had applied for a patent on their sand reel, and while the application for a patent was pending entered into a contract with defendant whereby plaintiffs granted defendant the exclusive agency and right to manufacture and sell the reel and made the defendant the exclusive agent of plaintiffs to make, sell and distribute the reels and parts of reels; that the reel was designated as the S. & B. Chain Driven Sand Reel; that on January 23, 1923, defendant agreed to pay plaintiffs a royalty on all of the reels and all parts of reels manufactured, sold or distributed by defendant, and that in pursuance of this contract the defendant manufactured, sold and distributed a great many S. & B. reels.

The petition further alleged that under the contract plaintiffs were entitled to inspect the books of the company, and that defendant refused to allow plaintiffs to make a full and complete inspection of its books; that on October 31, 1927, a dispute arose between plaintiffs and defendant as to the amount due and owing to plaintiffs by defendant, that defendant refused to pay royalties or permit an inspection of its books, and that defendant had sold a large number of S. & B. reels and parts not accounted for to plaintiffs. The first cause of action prayed judgment that the defendant be required to render an accounting for the number of S. & B. reels and parts manufactured and sold by it under the terms of the contract and for judgment for the amount due. The cause of action further alleged that on December 4, 1923, letters patent were issued by the United States on the S. & B. reel on the application which had been made at the time the contract was entered into, and that the letters patent were still in full force and effect and owned by plaintiffs.

The second cause of action made all the allegations of the first cause of action a part of the second. This cause of action then alleged that on December 27, 1921, the date of the contract, defendant was not engaged in the manufacture, sale and distribution of chain-driven sand reels or parts or like or similar articles as the S. & B. sand reel.

It further alleged that by the contract the defendant owed plaintiffs a duty to make the manufacture, sale and distribution of the S. & B. reel profitable to plaintiffs and owed plaintiffs a duty not to do anything that would destroy the sale and marketability of S. & B. reels.

It further alleged that some time prior to the filing of this suit defendant commenced the manufacture and sale and distribution of chain-driven reels and parts similar in construction embodying the same general principles and design and used for like or identical purposes as the S. & B. reel and had and were offering that reel as a substitute for the S. & B. reel.

The petition then alleged that in doing this defendant breached its contract with plaintiffs because it failed and neglected to make the manufacture and sale and distribution of the S. & B. reel a matter of profit to plaintiffs; that in so doing defendant engaged in a competitive enterprise and so breached its contract and duty as agent of plaintiffs.

The petition then alleged that there was a great demand by the public for S. & B. reels; that by the introduction of the competitive article by defendant, plaintiffs were greatly damaged because they would be put to a great expense in replacing the S. & B. reel on the market and in reëstablishing the demand by the public for the S. & B. reel. The petition alleged that plaintiffs had been thereby damaged in the sum of $10,000.

The petition then alleged that from August 31, 1927, to the date of the filing of the petition defendant had sold about 500 chain-driven sand reels other than the S. & B. reel, and that on this account plaintiffs had been damaged in the amount of the royalties that they would have received had defendant sold S. & B. reels specified in the contract and that, therefore, plaintiffs are entitled to royalties on the other reels on the same basis that they would have been entitled to royalties on S. & B. reels, that is, $100 a reel. Plaintiffs prayed judgment for $60,000.

Defendant is a Kansas corporation with its principal and only place of business at Coffeyville, Montgomery county. This suit was filed in Sedgwick county. Summons was served on R. D. Ekstrand and C. B. Morton in Sedgwick county. Ekstrand was a mechanic and "trouble shooter" for the company. Morton was a salesman for the company.

Defendant made a special appearance and filed a motion to quash each of these services on the ground that service upon them was not service on the company. These motions were overruled. The overruling of these motions is one of the errors of which complaint is made. Further attention will be paid to that later in this opinion.

In its answer to the first cause of action defendant admitted the signing of the contracts and alleged that the contract constituted an assignment or license under the patent; admitted that the letters patent were issued to plaintiffs on their invention and denied that the patent which was actually used was the one referred to in the contract. The answer further denied that defendant had refused to account to plaintiffs for royalties on sand reels covered by the contract and alleged that it had paid plaintiffs all royalties due.

The answer further alleged that during 1926 it became apparent that the S. & B. reel, in comparison with other reels that were on the market, was inadequate, complicated and subject to breakage of parts, and that on this account defendant, at a great expense, designed a new model embodying the plaintiffs' patented device whereby the reel was greatly simplified and designated this improved reel Model 27 and has continued to manufacture this improved reel; that some of the parts of Model 27 upon which it has refused to pay royalty are identical with parts which had been used in constructing the old model.

The answer further alleged that defendant had entered upon the execution of the contract; manufactured and sold reels and paid money as royalty to plaintiffs thereunder; that in the execution of the contract it incurred great expense in redesigning a sand reel; it had employed salesmen and service men to keep the reels in repair, and advertised them; that after 1927 it became almost impossible to sell the S. & B. reel, due to the fact that other reels were better because they eliminated plaintiffs' patented device, and that plaintiffs at no time since 1927 had done anything to make the patented device a success; that this was a breach of the contract on the part of plaintiffs.

For answer to the second cause of action defendant denied that it ever became the agent for the plaintiffs; denied that it ever manufactured and sold any sand reel embodying the plaintiff's invention other than the one known as the S. & B. reel.

The answer further alleged that defendant manufactured and sold sand reels from designs and patterns of parts embodying the invention of plaintiffs and by dint of great effort and expense did make the manufacture and sale of the sand reel a matter of profit up to and including the year 1926.

The answer further alleged that in 1927 other, better and more efficient chain-driven reels were placed on the market, and the S. &

B. reel became obsolete and was inferior to other reels; that defendant was unable to construct a better sand reel than those in competition with the S. & B. reel incorporating plaintiffs' patented device, which would meet competition; and that plaintiffs objected to changes in the design suggested by defendant.

The answer further alleged that in order to keep abreast of the times and to meet competition defendant did manufacture and sell another and different reel designated as the O. C. S. reel; that because it does not embody plaintiffs' device it is more efficient and satisfactory in operation than the S. & B. reel.

The reply of plaintiffs alleged that the parts contained in the redesigned Model 27 S. & B. reel were substantially the same as were specified for the original reel and were similar in design and served a like purpose.

The reply denied that the S. & B. reel covered by their letters patent ever became obsolete·and alleged that the defendant with diligent effort could have made the manufacture and sale of the S. & B. reel a matter of profit.

It further alleged that it was the duty of defendant to improve the S. & B. reel to meet changed conditions and that the O. C. S. reel came within the plaintiffs' patented device and that it was in the contemplation of the parties that the contract would cover all forms of chain-driven sand reels manufactured and sold by defendant and that plaintiffs are entitled to royalty on the O. C. S. reel and on all parts of the O. C. S. reel covered by the contract.

With the issues thus drawn the case was tried to the court. Extensive findings of fact and conclusions of law were made. The result was a judgment for the plaintiffs ordering an accounting.

It has been noted that a motion to quash the service of summons in this case was filed and overruled by the trial court. Defendant complains of this as error. We will deal with that question first.

The statute that deals with the method of obtaining service upon domestic corporations is R. S. 60-2518. It is as follows:

"A summons against a corporation may be served upon the president, mayor, chairman of the board of directors, or trustees, or other chief officer; or, if its chief officer is not·found in the county, upon its cashier, treasurer, secretary, clerk or managing agent; or if none of the aforesaid officers can be found, by a copy left at ·the office or usual place of business of such corporation, with the person having charge thereof."

Was service on Ekstrand, the trouble shooter, or Morton, the salesman, good service under this statute? The return of the sheriff,

after reciting that he had delivered the summons to Ekstrand, the company's managing agent, at its office and usual place of business in Wichita, stated that he could not find "the president, vice president, secretary, treasurer, cashier, trustee, or other managing officers of said company in Sedgwick county, . . . and that said officers of said company were not in my county."

The return then was as follows:

"I further certify that after endeavoring to get service on such officers of said company, and failing in such service, I made service on said R. D. Ekstrand, he being the person in charge of the office and usual place of business of said company at Wichita, Sedgwick county, Kansas, and he being the person held out to the public by said company as their agent and representative at Wichita, Kansas."

The motion to quash was as follows:

"Comes now the defendant, The Oil Country Specialties Manufacturing Company, a corporation, appearing specially and for the purpose of this motion only, and moves the court now here to quash, vacate and set aside the pretended summons and the pretended service thereof in the above entitled action, for the following reasons, to wit:

"1. Because there has been no service of summons upon the·said The Oil Country Specialties Company.

"2. Because there has been no service of summons upon the said company or upon any one connected with the company on whom, by law, service is authorized.

"3. Because said action was improperly instituted in Sedgwick county, Kansas.

"4. Because said pretended summons was improperly issued.

"5. Because said pretended summons and the return thereof are void and of no effect, and the court has not, by the issuance of said summons, obtained any jurisdiction whatever over said The Oil Country Specialties Manufacturing Company."

The court heard the motion to quash on affidavits and oral testimony. Ekstrand testified that he resided at 404 Market street in Wichita; that this was the address which plaintiffs claimed was the office of the company; that he never met customers in his room; that the company furnished him·cards; that he was a trouble shooter engaged in servicing O. C. S. machinery; that he had no other duties; he had no property of the company in his charge; he went wherever told to go by his superior officers; when he got a call for any work outside the routine he called up the office; he called up the company at Coffeyville two or three times a day. He had no authority to make charges for his work; the charge is made at Coffeyville. He collected and handled no money for the company. D. R. Brown,

vice president and general manager of the company, stated in his affidavit that Ekstrand was not an officer, cashier, treasurer, secretary, clerk or managing agent of the company and was not the person in charge of any office, and that Ekstrand was an employee in the mechanical department of defendant subject to the control of its managing officers.

C. B. Morton stated in his affidavit that his duties were those of salesman for defendant, authorized and required to sell and procure orders for the company's products; sometimes he supervised the installation and repair of machinery sold by defendant. He was stationed at Tulsa and was under the direction and control of J. W. McKown, who was also stationed at Tulsa and is subject to the direction and control of the managing officer at Coffeyville.

D. R. Brown stated in his affidavit with reference to Morton that he had never been an officer, director, cashier, treasurer, secretary, clerk or managing agent and had never been a person in charge of any office of defendant.

At this hearing plaintiffs introduced affidavits of persons whom Morton introduced to Ekstrand and stated that Ekstrand would be their representative in that territory; that Ekstrand had stated that orders for repair parts could be ordered through him; that Ekstrand called on people and stated he was agent and representative of defendant; that he maintained an office at 404 North Market street in Wichita, and that he would be subject to calls in event of trouble. The trial court did not make a finding of fact that this evidence disclosed that either Ekstrand or Morton were officers, cashiers, treasurers, secretaries, clerks or managing agents, or in charge of any office of defendant. This court has considered this question in *Betterment Co. v. Reeves*, 73 Kan. 107, 84 Pac. 560. There it was said:

"Whether one is a 'managing agent' of a foreign corporation on whom service of summons may be made must depend in every case upon the kind of business conducted by the corporation, what the general duties of the suggested 'managing agent' are, and whether it can be fairly said that service on such agent would bring notice to the corporation. Much discussion may be found in the cases upon this question, and it is one upon which there is some disagreement. It may be said, however, that the later decisions are more liberal in interpreting the term 'managing agent' than were the earlier ones. While no general rule can be stated which will serve as a test, certain principles may be announced which will serve to assist in determining the matter. Such managing agent must be in charge, and have the management, of some department of the corporation's business, the management of which requires of

the agent the exercise of an independent judgment and discretion; not that he shall not be under the general direction of the corporation—all agents are subject to the general control of their principals—but in the management of this particular department he must have authority to manage and conduct it as his discretion and judgment direct. He must be in the exclusive and immediate control and management of that department, or of the entire works conducted at the place where he is in charge." (p. 115.) See, also, *Van Deren v. Heineke & Co.*, 122 Kan. 215, 252 Pac. 459.

Very little can be added to the force of what was said in the above case. An examination of the record in this case has caused us to reach the conclusion that the work that was done by Ekstrand and Morton fell far short of meeting the requirement laid down in *Betterment Co. v. Reeves* in order to constitute one a managing officer or person in charge of any place of business of defendant. It is doubtful whether the trial court held otherwise on this point. So much attention has been given it in this opinion because counsel for plaintiffs argue vigorously in this court that the service was good.

The journal entry on this question was as follows:

"That it has full jurisdiction of the subject matter of this action and that said action was properly instituted in the above county and state, and that the defendant by its motion filed upon the——day of June, 1930, entered its general appearance herein and thereby waived all right to question as to the manner of service of summons."

During the argument on the motion the court said:

"I am going to overrule your motion. I think your ground No. 3 in which you state that said cause of action was improperly instituted in Sedgwick county, Kansas, amounts in effect to a demurrer to the court's jurisdiction on the ground that the court did not have jurisdiction of the subject matter of the cause of action, and for that reason you have entered a general appearance in the case and your motion to quash will be overruled."

It clearly appears that the court refused to sustain the motion to quash on the ground that the third ground stated in the motion constituted a general appearance and waived the defect in the service.

That ground was as follows:

"Because said action was improperly instituted in Sedgwick county, Kansas."

It is argued that this portion of the motion to quash was included in the motion and intended only to give a reason why the motion should be sustained. The argument is that what defendant intended to say was that the action was improperly brought in Sedgwick county because no service was had on the defendant in that county.

It seems clear that the argument on the motion was conducted on that theory. This court considered this question in *Thompson v. Greer*, 62 Kan. 522, 64 Pac. 48. This was an action brought in the district court of Butler county. At the commencement of the action plaintiff caused certain cattle belonging to the defendant, Thompson, to be attached. There was no service of summons upon the defendant.

The motion to dismiss was as follows:

"Now comes the defendant, R. S. Thompson, for the purpose of this motion only and for no other, and moves the court to dismiss this action for the reason that the court had no jurisdiction over the person of this defendant, and that this action is improperly brought in this county; that the defendant, R. S. Thompson, against whom alone this plaintiff seeks judgment and whose property plaintiff claims to have attached in this suit, is a resident of the county of Reno, state of Kansas, and has been for several years last past; that there has been no service had upon the said defendant in this county, and the court has no jurisdiction over his person or the subject matter of the action." (p. 522.)

Defendant's counsel appeared for the purpose of the motion only. The trial court held that the language in the motion "that this action is improperly brought in this county" constituted a general appearance. This court said:

"We think the court below erred in overruling the motion to dismiss. The application was based solely on jurisdictional grounds, and the appearance of the moving party was special." (p. 523.)

It is the rule in this court that in motions of this kind we look to the substance of the motion, not alone to the form. It is patent on the face of the motion that all the defendant intended to do was to contest the service of any summons upon it.

In the case of *Bishop v. Fischer*, 94 Kan. 105, 145 Pac. 890, the trial court in an action pending before it made an order against plaintiffs, who were not parties to the action, that they no longer maintain certain obstructions to the flow of gas, etc. Plaintiffs filed a motion, appearing specially and for the purpose of the motion only, in which they alleged that the property affected did not belong to the American Gas Company but belonged to them and was exclusively on their land; that they had not sold gas to the receiver or consented to the receiver's use of the pipes, and that the order was in effect a confiscation of plaintiffs' property made without jurisdiction. The relief asked was that the order be dissolved. It was

claimed that this was a voluntary general appearance. This court said:

"The plaintiffs' motion may be read in such a way as to indicate a general submission to the jurisdiction of the court, but here, as elsewhere in procedure, substance alone is to be regarded, and it is quite clear that the sole purpose was to challenge jurisdiction. The plaintiffs did not ask to be made parties, and the relief sought, the dissolution of the order, is entirely consistent with want of jurisdiction, and could be granted upon the hypothesis that the court had no jurisdiction." (p. 113.)

See, also, *Shearer v. Insurance Co.*, 106 Kan. 574, 189 Pac. 648; *Poorman v. Carlton*, 122 Kan. 762, and *City of Coffeyville v. Wells*, 137 Kan. 384, 20 P. 2d 477.

Many cases are cited by plaintiffs on this point, but they are all cases where the defendant either asked for some affirmative relief or took some affirmative action, such as filing an answer asking for time to plead, or filing a demurrer. In this case the defendant did not ask for any affirmative relief and, under the decision we have cited, asked for nothing except the quashing of the summons. We hold, therefore, that the motion to quash the summons should have been sustained.

This conclusion might well dispose of the case. However, since the case took many days to try and there is one other question in it, the decision of which disposes of the right of plaintiffs to recover under the contracts in question, that point will be discussed.

It is contended by the defendant that the parties did not comply with the provisions of R. S. 57-101 *et seq.* The statutes in question are as follows:

"It shall be unlawful for any person to sell or barter or offer to sell or barter any patent right, or any right which such person shall allege to be a patent right, in any county within this state, without first filing with the clerk of the district court of such county copies of the letters patent duly authenticated, and at the same time swearing or affirming to an affidavit before such clerk that such letters patent are genuine, and have not been revoked or annulled, and that he has full authority to sell or barter the right so patented; which affidavit shall also set forth his name, age, occupation and residence; and if an agent, the name, occupation and residence of his principal. A copy of this affidavit shall be filed in the office of said clerk, and said clerk shall give a copy of said affidavit to the applicant, who shall exhibit the same to any person on demand. (L. 1889, ch. 182, § 1; March 15.)" (R. S. 57-101.)

"Any person who may take any obligation in writing for which any patent right, or right claimed by him or her to be a patent right, shall form a whole or any part of the consideration, shall, before it is signed by the maker or

makers, insert in the body of said written obligation, above the signature of said maker or makers, in legible writing or print, the words, 'Given for a patent right.' (L. 1889, ch. 182, § 2; March 15.)" (R. S. 57-102.)

"Any person who shall sell or barter or offer to sell or barter within this state, or shall take any obligation or promise in writing for a patent right, or for what he may call a patent right, without complying with the requirements of this act, or shall refuse to exhibit the certificate when demanded, shall be deemed guilty of a misdemeanor, and on conviction thereof before any court of competent jurisdiction shall be fined in any sum not exceeding one thousand dollars, or be imprisoned in the jail of the proper county not more than six months, at the discretion of the court or jury trying the same, and shall be liable to the party injured, in a civil action, for any damages sustained. (L. 1889, ch. 182, § 3; March 15.)" (R. S. 57-103.)

The fact that this statute had not been complied with was not pleaded in the answer of defendant. During the trial of the case the defendant introduced the evidence of the clerks of the district court of Montgomery county and of Butler county, showing that the plaintiffs had not up to that time complied with the provisions of R. S. 57-101 to 57-103 with reference to the filing of affidavits and copy of patent. Later the court struck out this evidence. During the trial the defendant asked permission to file an amendment to its answer setting up the failure of the plaintiffs to comply with these provisions of the statute and proffered the amendment to the court. This application was overruled. During the trial plaintiffs, by permission of the court, filed an amended petition in which they brought their claim up to date. When this amended petition was filed the defendant filed an answer in which it alleged among other things that the contracts in controversy were null and void and not binding upon the defendant because the plaintiffs had not complied with R. S. 57-101 to 57-103, either at the time of making the contract or at any time, and setting out the facts showing said noncompliance. On motion of plaintiffs this answer was stricken out.

The argument of defendant is that the contract and the supplemental contract are within the provisions of R. S. 57-101, 57-102 and 57-103; that plaintiffs did not comply with the terms of the statute and hence no recovery can be had on the contracts. The pertinent portions of the contracts are as follows:

"Exhibit A

"Whereas, Said patentees have invented a device for a sand reel to be used in and about a drilling rig, which they represent is patentable, and have made an application for letters patent to them covering said device, a blue print of which is hereto attached, made a part hereof and marked exhibit A, and desire

to make a contract for the manufacture and sale of said device, and the company desires to manufacture and sell said device.

"Now, therefore, In consideration of the premises, and of the sum of ten ($10) dollars, by each of the parties hereto paid to the other, and of the mutual covenants and agreements of the parties hereto, the parties hereto agree with each other, as follows:

"(1) The patentees do hereby grant to the company the exclusive right to manufacture and sell said above described device for the full term of the patents granted, and for any extensions of time that may be hereinafter granted and they further agree that for said consideration they will and they do hereby grant to the company the exclusive right to manufacture and sell any and all improvements on said device which they may hereafter make or control.

"(2) Said patentees hereby promise and agree to furnish and deliver to the company at Coffeyville, Kansas, all the patterns and moulds which are now on hand or under the control of the patentees, relating to said sand reel.

"(3) The said patentees hereby agree to furnish to the company three copies of the letters patent for said sand reel when the same are granted, and thereupon, on request of the company, to execute such further assurances and conveyances with reference thereto as may be necessary to make this agreement effective and binding upon the patentees.

"(7) The company agrees to advertise said sand reels, but it is further agreed that the company shall be the sole judge as to what is sufficient advertising.

"(8) In case the company shall make any improvements on said sand reel which are patentable, it agrees to incorporate said improvements in its manufacture of said sand reels without any expense to said patentees except only the cost of procuring the patents therefor, and the royalty to the patentees, on said sand reels with said improvements added, shall remain the same as herein provided.

"(9) The company agrees that it will not grant to any other person or company the exclusive right to sell sand reels."

### Exhibit B, the supplemental contract, is as follows:

"Whereas, A prior contract has been entered into between the above-named parties on the 27th day of December, 1921, special reference is made to article No. 4 of said contract which is hereby amended to read as follows:

"(4) To manufacture sufficient of said sand reels to supply the demand of the trade and to pay to the patentees, as royalty on said sand reels manufactured and sold by it, . . .

"The company agrees to pay as royalty twenty (20) per cent of its selling price, said royalties are to become due and payable on the 20th day of each month for all said sand reels and parts sold during the previous month.

"It is not the intent or purpose of this supplemental contract to change, alter or disturb any of the provisions of the original contract dated December 27, 1921, except article 4 as above referred.

"In witness whereof, the said parties have hereunto set their hands this 23d day of January, 1923."

The contract sued on in this case clearly provided for the sale of a patent right. It recites that plaintiffs have invented a device and have made application for letters patent. It then grants to defendant the "exclusive right to manufacture and sell" the device. The supplemental contract deals only with the royalty that is to be paid plaintiffs. The causes of action were drawn clearly on the theory that the relief sought was an accounting for the manufacture and sale of a patent right and damages for the violation of the contract in question. R. S. 57-101 makes it unlawful to enter into such a contract unless copies of the letters patent are filed with the clerk of the district court, together with certain affidavits. That was not done in this case. Hence the contract sued upon was in violation of law. Plaintiffs have been liable to punishment under the statute in question from the first day of its execution.

Can one who has entered into a contract in violation of law sue and recover for a breach of the contract? This court has answered this question many times in the negative.

In *Mason v. McLeod*, 57 Kan. 105, 45 Pac. 76, this court passed on the statute for the first time. There suit was brought to set aside notes and conveyances of land that had been given in payment of a sale of patent rights. The constitutionality of the statutes was attacked. The court said:

"There were some early decisions holding that such regulations trenched upon the federal power and the rights of the patentee, but recent authorities hold that reasonable police regulations may be enacted by the state without usurping any of the powers of the federal government or infringing upon the exclusive rights of the patentee. (*Brechbill v. Randall et al.*, 102 Ind. 528; *New v. Walker*, 108 id. 365; *Pape v. Wright*, 116 id. 502; *Sandage et al. v. The Studebaker Brothers Manufacturing Co.*, 142 id. 148; *Tod v. Wick Brothers & Co.*, 36 Ohio St. 370; *Herdic v. Roessler*, 109 N. Y. 127; *Haskell v. Jones*, 86 Pa. St. 173; *Patterson v. Kentucky*, 97 U. S. 501; *Webber v. Virginia*, 103 id. 344.) The doctrine of these cases is that the patent laws do not prevent the state from enacting police regulations for the protection and security of its citizens, and that regulations like ours, which are mainly designed to protect the people from imposition by those who have actually no authority to sell patent rights or own patent rights to sell, should be upheld. We think the statute is valid.

"The purpose of the statute, as we have seen, was to prevent and punish fraud, and noncompliance with its provisions is declared to be a misdemeanor, punishable by fine or imprisonment. The penalty implies a prohibition, and

contracts made by a vendor of patent rights in violation of the act are void as between the parties. The transfer of Mason, being illegal, did not constitute a valid consideration for the money or property obtained from McLeod."

As far as we can learn, that case settled the question of whether the act in question was in violation of the federal constitution.

The matter was again before this court in *Pinney v. Bank,* 68 Kan. 223, 75 Pac. 119. There the court held:

"Where a statute expressly provides that a violation thereof shall be a misdemeanor, a contract made in direct violation of the same is illegal and there can be no recovery thereon, although such statute does not in express terms prohibit the contract or pronounce it void.

"A sale of the exclusive right to manufacture, use and sell for use a patented invention in a specified territory for a period of two years carries with it an interest in the patent right itself, and constitutes a sale of a patent right within the meaning of the 'act relating to the registration and sale of patent rights, and prescribing a penalty for the violation of the same.'" (Syl. ¶¶ 2, 3.)

Again, in *Hager v. Hale,* 110 Kan. 507, 204 Pac. 529, this court said:

"The defendant argues that under the contract he sold to the plaintiffs not a patent right, but an invention, a process of manufacturing a vulcanizing composition, the right that the defendant had in the discovery made by him. The plaintiffs argue that by the contract the defendant sold to them the rights purported to be given by letters patent. This involves an interpretation of the language used in the contract. It concerned a patent right, existing or nonexisting.

"The fact that letters patent had not been issued did not change the subject matter of the contract. That remained a patent right. 'The right and title to letters patent' was the language used to describe the thing sold. That language meant nothing more and nothing less than a patent right. After the use of that language, the contract went on to describe the patent as being one 'on a vulcanizing compound' for which an application for letters patent had been filed on May 25, 1918, and allowed September 17, 1918. In one paragraph of the contract the defendant agreed to 'turn over and transfer his right, title and interest in said letters patent.' There is but one reasonable interpretation of the contract, and that is that the defendant was undertaking to sell a patent right. It may be granted that all parties knew that letters patent had not been issued, but still they were arranging for the sale and purchase of a patent right. The statute was meant to meet just such a situation, the sale of a patent right by one who did not hold letters patent."

It will be noted that this case holds that the statute applies even though the patent has not been issued but only applied for at the time the contract is executed.

To the same effect is the holding of the court in *Schmoyer v. Van Hosen,* 111 Kan. 759, 208 Pac. 554.

In *Ridgway v. Wetterhold*, 96 Kan. 736, 150 Pac. 490, plaintiff, who had invented and owned the patent right to a bedspring, sold the defendant an interest in the patent without complying with the statute.

The exclusive right to manufacture and sell the bedsprings was sold to defendant, plaintiff to install machinery for the manufacture of the bedsprings. Plaintiff sued. This court refused to allow recovery on the contract. The court said:

"The statute (Gen. Stat. 1909, sec. 5517) makes it unlawful for the owner of a patent to enter into a contract for the sale of any interest therein unless he has first complied with the provisions of the statute, and the owner is liable to fine and imprisonment for any violation of the statute. In *Pinney v. Bank*, 68 Kan. 223, 75 Pac. 119, a similar contract made in violation of the statute was declared void." (p. 737.)

There is no distinction between this case and the cases cited. In this case the contract sued on conveyed the interest of plaintiffs in their invention. The statute was not complied with by plaintiffs, hence the contract was unlawful. This being the case, no right which might be enforced in court could spring from it.

It will be noted that defendant did not plead the failure of plaintiffs to comply with the statute in its answer and requested permission to amend by pleading this defense during the course of the trial. This request was denied. Plaintiffs argue that this refusal was not an abuse of discretion by the trial court, and that since the defense was not pleaded it is not now available.

In *Sheldon v. Pruessner*, 52 Kan. 579, 35 Pac. 201, this court considered this question. There it was said:

"The courts, in the due administration of justice, will not enforce a contract in violation of law, or permit a plaintiff to recover upon a transaction against public policy, even if the invalidity of the contract or transaction be not specially pleaded." (Syl. ¶ 1.)

In *Patterson v. Glass Co.*, 91 Kan. 201, 137 Pac. 955, it appeared during the course of the trial that the contract sued on was in violation of the anti-trust laws of the United States and this state. This court held:

"Whenever at any stage of the proceedings it is established to the satisfaction of the court that the cause of action upon which the plaintiff seeks to recover arose out of an unlawful conspiracy, it becomes at once the duty of the court to refuse to aid either party to profit by the iniquitous agreement." (Syl. ¶ 2.)

See, also, *Coppell v. Hall*, 74 U. S. 542, 19 L. Ed. 244; also, *Oscanyan v. Winchester Repeating Arms Co.*, 103 U. S. 261, 26 L. Ed. 539.

We hold that when it becomes apparent that a contract sued on is in violation of the law it is the duty of the court to dismiss the action, no matter whether the illegality has been raised by pleadings or not.

There are many interesting questions raised as to the mechanical features of this case, but the conclusion we have reached renders a discussion of them unnecessary.

The judgment of the trial court is reversed, with directions to render judgment for the defendant.

HUTCHISON, J., not sitting.