No. 38,970

J. D. Freeman, *Appellee*, v. A. Lea Keltner, *Defendant*, National Lead Company, Garnishee, *Appellant*.

(259 P. 2d 228)

38

Opinion filed July 6, 1953.

*Lyndon Gamelson* and *Edward Weil*, both of Wichita, argued the cause, and *W. E. Holmes* and *Donald I. Mitchell*, both of Wichita, were with them on the briefs for the appellant.

*H. W. Goodwin*, of Wichita, argued the cause, and *Port Early*, of Wichita, was with him on the briefs for the appellee.

The opinion of the court was delivered by

WEDELL, J.: This is an appeal by National Lead Company, a foreign corporation, garnishee defendant, from an order and judgment overruling its motion to quash the service of garnishment summons.

Appellee, J. D. Freeman, filed an action in the district court of Harvey county for a money judgment against the principal defendant, A. Lea Keltner, a nonresident of the state. The return of summons disclosed he was not found in Harvey county. Thereafter garnishment summons was issued to be served on appellant. The sheriff's return shows the president, chairman of the board of direc-

tors, trustees or other chief officers of appellant could not be found in Harvey county and the summons was served on H. P. Horne, managing agent and employee of appellant.

After that service appellee obtained service on the principal defendant by publication and in the same publication gave notice to him of the service of garnishment on appellant and advised if he (Keltner) did not answer by a stated date judgment would be rendered against him and also against appellant subjecting all debts due to him from appellant for the satisfaction of any judgment that might be obtained against him and for costs of the action. Neither the principal defendant nor appellant appeared by answer or otherwise. Thereafter a default judgment was first rendered against the principal defendant *in rem*. That journal entry further recites:

"And, after the rendition of such judgment against the defendant, the matter then comes on for the attention of the Court upon the oral motion of the plaintiff for judgment against the garnishees herein under the provisions of Section 60-947 R. S. 1935, because of their failure, neglect and refusal to file an answer in garnishment or affidavit, as required by law.

"The plaintiff then introduced evidence in support of said motion and the COURT FINDS that the summons in garnishment in this matter was duly served upon H. P. Horne, *Managing Agent and employee of the National Lead Company, as shown by the return of the sheriff upon the summons in garnishment* but that the said garnishees have wholly failed, neglected and refused to file an answer in garnishment, an affidavit or other pleading in response to such garnishment summons." (Italics supplied.)

About eight months later appellant appeared specially and moved to quash the service on it, contending the service was invalid. Appellant's first contention is H. P. Horne was not a "managing agent" and the court obtained no jurisdiction over it or the subject matter. To its motion were attached supporting affidavits. Appellant also introduced oral testimony and appellee introduced evidence in opposition. The court sustained the service and the appeal is from the judgment overruling the motion to quash it. There was no motion to set aside the judgment against appellant and there is no appeal from that judgment. No issue is raised by the parties touching the last matters and they will not be treated.

The venture or undertaking in which H. P. Horne, the person served with summons, was engaged for appellant in Kansas consisted of assembling, repairing and field testing a device used in oil fields and referred to by the parties as a "Keltner Variable Stroke Pump Unit." Horne was the only representative of appellant in Kansas on that undertaking and lived in Newton, Harvey county,

while so engaged from September 1, 1948, to February 11, 1949, a period of about five and one-half months.

Four supporting affidavits were attached to appellant's motion. One from the secretary of state disclosed Harry W. Colmery was appellant's resident agent in Kansas and his address was National Bank of Topeka Building, Topeka. The affidavit of the resident agent stated no statutory service of process of garnishment summons had been made on him.

Another supporting affidavit was that of H. H. Farnham, which was in part as follows:

"That I am employed by the Baroid Sales Division, National Lead Company, a New Jersey Corporation; that I am Assistant to the General Manager.

"That the home office of said Corporation is at 830 Docummun Street, Los Angeles 12, California, and a District Office is located at Houston, Texas, where I make my headquarters. That my duties are to supervise the distribution of the Company's products in that geographical area. That I am the immediate superior of Mr. D. D. Powers, who was responsible for the assembly and testing of the Keltner pump unit.

"That the Company was authorized to do business in Kansas on February 16, 1937, and is still so authorized. That the principal business in Kansas of the National Lead Company is the sale of oil well drilling mud additives. Sales of these additives are made principally through oil well supply houses. District offices, such as the office at Houston, Texas, supervise the distribution of these products in the adjacent geographical area. In addition to the drilling mud additives the Company does sell a few mechanical devices used in oil well drilling activities. These include a Pulsation Dampener for oil rig mud pumps and a Pipe Wiper.

"That the Company employs men familiar with drilling mud and its use in oil field drilling operations. These men are designated 'Drilling Mud Service Engineers', their duties are to give advice to oil field drillers in the use of mud, to aid in the mixing of mud and to create good will and thereby promote further sales.

"That Mr. H. P. Horne was employed as such Drilling Mud Service Engineer, working in the vicinity of Houston, Texas, prior to September 1, 1948. Mr. Horne was familiar with oil field machinery and devices, he was adept at working with machinery and skilled in mechanics. For that reason, on September 1, 1948, I directed him, through Mr. Powers, to go to Newton, Kansas for the purpose of assembling, repairing and fieldtesting a Keltner Pumping Unit.

"That the National Lead Company entered into a contract on February 1, 1948 with Mr. A. Lea Keltner of Phoenix, Arizona, under which the Company was licensed to develop, manufacture and sell the pumping unit which Mr. Keltner had been working on and which was referred to as a Keltner Variable Stroke Pump Unit. The contract with Keltner included the purchase of some unassembled parts stored in the R & M Machine Shop at 119 East Third, Newton, Kansas, and a partially assembled experimental pump unit. The R & M Machine Shop was an independent establishment, which was employed to do

blacksmith and machine work. I put D. D. Powers in charge of and made him responsible for the testing and improving of these devices. Mr. Powers and Mr. Horne worked on the assembly of one unit from the parts at Newton, Kansas, which unit was placed upon a well on the Ralph Wixsom lease near El Dorado, Kansas. After a period of months Mr. Powers found that the unit fatigued and failed and with my approval had the unit removed and returned to Newton, Kansas."

An additional portion of Farnham's affidavit was, in substance:

Horne was not authorized by him or Mr. Powers or anyone in the company to solicit sales of anything assembled from the parts purchased from Keltner and was not authorized to enter into any contracts; no sale of the Keltner Pump Unit was made by Horne or anyone else on behalf of the company, the unit was an experimental device and was not perfected or offered for sale by the company.

The remaining material portion of Farnham's affidavit corroborates the affidavit of D. D. Powers. The full affidavit of Powers was:

"That I am employed by the National Lead Company, a New Jersey Corporation; that I make my headquarters at the Houston, Texas Office of the Baroid Sales Division of the National Lead Company; that I supervise the Field employees and supervise the development of specialty devices for the Company.

"That I was the immediate superior and supervisor of Mr. H. P. Horne during the period he was in Newton, Kansas, from September 1, 1948 to February 11, 1949. That he had been employed by the Company as Drilling Mud Service Engineer in the vicinity of Houston, Texas, prior to coming to Newton on the above date. Mr. Horne was sent to Newton, Kansas to work on an experimental pumping unit, which was being assembled from parts purchased by the company from Mr. A. Lea Keltner. These parts were located at the R & M Machine Shop at 119 East Third Street, Newton, Kansas, which was an independent establishment, which I employed to do blacksmithing and mechanical work. Mr. Horne was directed to watch the operation of that experimental unit on a well on the Ralph Wixsom lease near El Dorado, Kansas. I directed him to and he, did replace various parts and make other mechanical changes in that unit. Neither I, nor anyone in the Company authorized him to sell any pumping unit nor to solicit sales of it or to enter into any contract with anyone concerning a pumping unit or any other product that the Company was interested in. I did authorize and direct him to use such time as he could spare from his work on the pump to contact supply stores and oil well supply distributors and develop interest in the sale and use of the Gadco Pulsation Dampener, for which the Baroid Sales Division, National Leade Company, was Jobber.

"Mr. Horne was paid on a salary basis. He reported directly to me by letter and telephone and I directed his activities by letter and telephone and made a personal visit to him in Kansas, to determine what repairs and changes should be made to the pump unit. I told him to make those repairs and changes in the pump unit.

"After a period of months, I decided that the test unit did not operate satisfactorily, so I directed Horne to remove it from the Wixsom Lease and bring it back to Newton. I sold all the parts that had been bought from Keltner and also the test unit and all other parts used in building it for junk, at Newton, Kansas, for $200.00. No other sale of the Keltner unit was made by National Lead Company or anyone in its organization.

"I ordered Mr. Horne from Kansas on February 11, 1949, and sent him back to his previous work as Drilling Mud Service Engineer in which capacity he is still employed by the Company, being now located at Carthage, Texas.

"Mr. Horne was never referred to as Managing Agent. I gave him no discretion in connection with the Keltner contract or the development of the Keltner Pumping unit. Horne is familiar with oil field machinery and familiar with the practical operation of machinery and mechanical work. He was instructed solely to assemble, repair and test the unit and make reports on it. He made frequent reports to me concerning the assembly and repair of the experimental unit and its performance and took orders from me concerning the testing of the unit, changes to make on it, and its ultimate disposition as junk. Mr. Horne was not at the time of the pretended service and is not now an Officer or Managing Agent of the National Lead Company.

"I did not authorize Mr. Horne to receive any Service of Summons on the Company nor authorize him to file any answer or affidavit in the garnishment proceeding in the case of Freeman v. Keltner, District Court, Harvey County, Kansas."

F. M. Estep, a witness for appellant, testified, in substance:

He was employed by Baroid Sales Division of appellant as district superintendent and lived at Great Bend; the home office of appellant is in Houston, Texas; there are division offices in various states including about twelve districts; the Baroid Sales Division is commonly referred to as the oil field branch of appellant; it is engaged in manufacturing, sales and service of drilling fluid additives and associated specialty lines; by drilling additives he meant drilling mud primarily and also clay or lost circulation materials; these products are distributed through five distribution outlets in Kansas; his duty was the supervising of service personnel and correlating sales efforts with distributors; he did not work under the Houston, Texas, but under the Tulsa division office; his work consisted entirely of the sale of mud and the servicing of oil and gas wells; he had nothing whatsoever to do with the Keltner pump project; he had no jurisdiction over that matter at all; at the time Horne was engaged in his work he, Estep, was in the Rocky Mountain region.

The testimony of R. G. Mourn, a witness for appellant was, in substance:

He did welding and machine work in his shop at Newton; D. D.

Powers originally brought Mr. Horne to his place of business and made arrangements for credit on work Mr. Horne might order done on the pump unit; he made parts at Horne's request and later the complete pump unit was brought to his shop and a new shaft was put in as the main shaft had broken; Horne assembled the parts for the machine; he sent a monthly bill to the appellant company for whatever work Horne ordered to be done; Horne was required to sign the bills; Horne was the person who ordered him to do work from time to time; after Horne signed the bills he received his monthly payments from Houston, Texas; he did whatever Horne asked him to do; his work amounted to about $200.

The testimony of appellant's witness, H. P. Horne, was, in substance, as follows:

He was sent to Newton in September, 1948, and was under the direction of Mr. Powers, manager of appellant's specialty department of Houston, Texas; he first came to Newton with Mr. Powers; he worked with Powers at the pumping unit when it was initially installed on a lease at El Dorado; the unit consisted of heavy machinery and was handled with a winch truck; he, not Powers, did the actual maintenance and installation work and maintained the unit; he attempted to keep the machinery in working order during the time he was located in Kansas; he hired a laborer to assist him when a sheave had to be changed on the unit; one man could not do it alone; he obtained and installed new belts when the old ones failed; the shaft ultimately broke and the unit was removed to the R & M Machine Shop (Mourn's shop), at Newton; there he tore the unit down and repaired it; he put in a new shaft and bearings; Mr. Mourn assisted him; his company had no sign on the shop.

And he further testified:

He hired help to take the heavier part of the unit back to El Dorado where new parts were installed; the maximum amount he was authorized to pay for materials or services out of pocket was $25; he included those amounts in his expense statements and the company paid them; he did not know what the limit of his purchasing power was where purchases were handled by orders he placed for materials; the supplier of materials simply made out the ticket for the purchases he made; the company paid the bills directly to the suppliers of the materials, provided he had approved the purchases by his signature; he had the power and authority to purchase parts or labor for the maintenance, repair and development of the machine; he had the right to purchase what-

ever he wanted; he made the decisions as to what was needed at any given time; he identified various exhibits of purchases he had handled in that manner; he hired a truck driver for hauling heavy types of machinery.

He further testified:

He did not work under Mr. Estep in any way; he made no reports to him and took no orders from him; there was no one in Kansas from whom he took orders; he was the only person working on the Keltner pump in Kansas and the only person who had taken up his residence in Kansas for that purpose; when he finished the work for which he was sent into Kansas he employed a truck driver, who had a truck suitable for hauling that type of machinery, and had the entire unit hauled back into Newton; part of the machinery was stored in the R. & M. Machine Shop, part of it at the International Harvester place and other parts in a fair building in Newton; Powers instructed him to move the equipment to the fair building; it was he, Horne, who made the arrangements for the storage of the equipment; it was he, Horne, who agreed upon the rental that was to be paid; he knew the rent had been paid; he paid the trucker who hauled the machinery to the fair building.

Appellee's testimony disclosed Horne had told him he was the resident engineer in charge of the development of this equipment. Horne did not deny having made that statement but said he did not remember making it. Appellee introduced a letter his counsel had written to Horne which read:

"November 10, 1948

"Mr. H. P. Horne,
"511 East 2nd Street,
"Newton, Kansas.

"Re: J. D. Freeman vs. A. Lea Keltner

"Dear Mr. Horne:

"*You called me on 1 November and told me that you were about to file an answer for the garnishees in this case.*

"I called the Clerk today and she states that no answer has as yet been filed.

"I will appreciate it very much if you will advise me as to when we may expect an answer for the garnishees to be filed. I am

"Very truly yours,
"H. W. Goodwin"

(Emphasis supplied.)

Horne admitted he received the letter but stated he had no idea what he had done with it. Horne did not deny having made the statement italicized in the above copy of the letter but stated he did not remember making it.

Whether Horne was the managing agent of the venture, enterprise or undertaking in question was one of fact to be determined from the evidence. (*Betterment Co. v. Reeves*, 73 Kan. 107, 114, 84 Pac. 560, [1906].)

"In general, a managing agent must be some person invested with general powers, involving exercise of judgment and discretion; but whether the person served is within the terms of the statute depends on the facts of the particular case." (20 C. J. S., Corporations, § 1942c., p. 210.)

In the same text and section it is said:

"It is difficult to formulate and apply a general rule as to what will constitute a person a managing agent, and it is necessary to determine each case on its particular facts. The later decisions are apparently more liberal in interpreting the term 'managing agent' than were the earlier ones . . ." (p. 211, 212.)

citing *Betterment Co. v. Reeves*, supra.

It is clear legislatures of the various states attached some importance to the term "managing agent" and employed it to distinguish such a person from an ordinary agent or mere employee who acts in an inferior capacity and under the direction and control of some superior authority in respect to both the extent of the work and the manner in which it is performed and who has no right to exercise his own discretion and independent judgment in the particular enterprise involved.

In the early Betterment Co. case, *supra*, is found a carefully guarded statement followed in *Sage v. Oil Country Specialties Mfg. Co.*, 138 Kan. 501, 27 P. 2d 542, and frequently cited with approval by other courts. It is:

"Whether one is a 'managing agent' of a foreign corporation on whom service of summons may be made must depend in every case upon the kind of business conducted by the corporation, what the general duties of the supposed 'managing agent' are, and whether it can be fairly said that service on such agent would bring notice to the corporation. Much discussion may be found in the cases upon this question, and it is one upon which there is some disagreement. It may be said, however, that the later decisions are more liberal in interpreting the term 'managing agent' than were the earlier ones." (p. 115.)

The same statement continues:

"While no general rule can be stated which will serve as a test, certain principles may be announced which will serve to assist in determining the matter. Such managing agent must be in charge, and have the management, of some department of the corporation's business, the management of which requires of the agent the exercise of an independent judgment and discretion; not that he shall not be under the general direction of the corporation—all agents are subject to the general control of their principals—but in the management of his particular department he must have authority to manage and

conduct it as his discretion and judgment direct. *He must be in the exclusive and immediate control and management of that department, or of the entire works conducted at the place where he is in charge."* (Italics supplied.) (p. 115.)

In 20 C. J. S., Corporations, § 1942b, are contained statements pertaining to various aspects of the rule. It reads:

"The question turns on the character of the agent, and, in the absence of express authority given by the corporation, on a review of the surrounding facts and the inferences which may properly be drawn therefrom. The test is whether the agent served sustains such relation to the corporation or to the business out of which the alleged cause of action arose as to justify a fair and reasonable inference of a duty on his part to communicate the fact of service to the corporation. In other words, process must be served on an agent sustaining such a relation to the corporation that notice to the agent may well be deemed notice to the principal, without a violation of the principles of natural justice." (p. 207, 208.)

The same statement continues:

"The fact that the parties, as between themselves especially, disclaim their relation to be that of principal and agent is not decisive as against an inference of law from the facts surrounding the relationship. Also, the name which the person assumes, even with the knowledge of his principal, or the name by which he is styled by the corporation, will not be controlling when the real character of his employment appears. *The agent served must have some charge or measure of control over the business intrusted to him or of some feature of it; but where he is directly connected with the corporate affairs, or is conducting some of the corporate business, so that through him the corporation is legally represented, the nature or the amount of business that he transacts in the state is not of great importance."* (p. 208.) (Our italics.)

See, also, 42 Am. Jur., Process, § 109.

This court early determined the statute pertaining to service on a "managing agent" should be liberally construed in favor of valid service where foreign corporations are involved. In the Betterment Co. case, *supra,* it was stated:

"Statutes which provide for service of process on foreign corporations should be liberally construed for the accomplishment of the purpose intended, namely, that of bringing such persons into court. They are permitted to enter the state by comity only, and in the methods of subjecting them to the jurisdiction of the courts they cannot insist upon a technical or strict construction in their favor." (p. 114.)

Applying the foregoing principles we turn to the facts in this particular case. Was there evidence to support the finding of the court that Horne was the managing agent of this particular enterprise in Kansas? Appellant argues there was not; that Horne was merely a mechanic and possessed no right to exercise discretion or an inde-

pendent judgment relative to the development of the Kansas enterprise or venture. That contention is in line with the supporting affidavits attached to appellant's motion. The trial court, however, did not reach such a conclusion from the entire record.

The record discloses appellant chose Kansas as its testing field for the development of an important new type of machine for the oil industry. For that particular purpose appellant sent Horne into Kansas. He lived in Harvey county for almost six months while engaged in the attempt to develop the proposed machine. In order to enable Horne to execute properly his assignment of duty in Kansas appellant prearranged credit here with suppliers of materials and with the owner of a machine shop at which Horne could order materials and work he decided to have performed on the machinery. Horne was the only person in Kansas connected with this particular enterprise. Although he, of course, was under the direction of the appellant corporation, as all agents are, the trial court was justified in concluding from Horne's own testimony and acts that he was in the control and management of this particular enterprise in this state. His evidence disclosed he had the power and authority to exercise discretion and his own independent judgment with respect to the development of this enterprise. It was Horne who had the right to determine at all times what was needed. It was he who made such purchases of materials as he believed were necessary and proper for the successful testing and development of the machine. It was he who hired laborers and truck drivers in connection with the venture. It was he who made the agreement for the rental of a building in which to store the machinery. Moreover, appellant ratified Horne's every act concerning which he exercised his discretion and independent judgment by the payment of obligations he incurred for materials, repairs, machine shop work, service of laborers, the hiring of truckers and for the rental of a building for storage of the machinery. Horne knew of no limitation on his authority to bind appellant with respect to whatever Horne believed necessary to test and develop the new machine for appellant's benefit.

It is clear Horne exercised the powers delegated to him and, as stated, appellant ratified his acts. Supposing appellant had been sued on any of the obligations Horne incurred in the exercise of his discretion and independent judgment, would it have constituted a defense for appellant to assert Horne was not its managing agent

of the Kansas enterprise and that he had no authority to bind it? We do not think so. We think there was substantial evidence to support the trial court's finding of fact that Horne was appellant's managing agent of the particular enterprise in Kansas. Under the repeated decisions of this court it will not disturb a finding of fact where there is substantial evidence to support it notwithstanding there is contrary evidence.

Appellant leans heavily on *Sage v. Oil Country Specialties Mfg. Co.,* supra. That was an action against a domestic rather than a foreign corporation with its main office located at Coffeyville. The purported service was there obtained on two persons, a salesman and a "trouble shooter" for defendant while they were in Sedgwick county. This court quoted with approval from the Betterment Co. case, *supra,* relative to what constitutes a person a managing agent. But it refused to hold either of the parties served was such an agent. We adhere to the decision on the basis of the facts recited in that opinion. They are dissimilar in various respects to those in the instant case. We also pause to observe the district court did not in that case, as it did in the case before us, find either of the parties served was a managing agent.

G. S. 1949, 60-2524, provides:

"Where the defendant is a foreign corporation, having a managing agent in this state, the service may be upon such agent."

We need not discuss the wisdom of that statute or whether service might have been had on the resident agent of appellant in Topeka. It repeatedly has been held the various statutory methods for service on a foreign corporation are cumulative and a plaintiff may select any of them. (*Betterment Co. v. Reeves,* supra, p. 114; *Jones v. Insurance Co.,* 83 Kan. 44, 109 Pac. 1077; *Nowak v. Insurance Co.,* 103 Kan. 778, 779, 176 Pac. 654; *Magnolia Petroleum Co. v. Moyle,* 162 Kan. 133, 139, 175 P. 2d 133.) See, also, reference in last cited case to G. S. 1949, 60-2522.

Appellant argues no garnishment summons was served on the principal defendant as required by G. S. 1949, 60-943 before judgment was rendered against appellant as garnishee. Of course, such prior service on the principal defendant was necessary. (*Porter v. Trapp,* 160 Kan. 662, 165 P. 2d 591.) But garnishment summons was served on the principal defendant, a nonresident, by publication, the only method available, before judgment was rendered against appellant. Thereafter judgment was first rendered against

the principal defendant *in rem* and then against appellant. Appellant fails to indicate in what respect the procedure failed to comply with the statutory requirements.

Appellant finally argues the service on it was invalid for the reason the first publication service on the principal defendant was not commenced within sixty days after the filing of the action, citing G. S. 1949, 60-308, which reads:

"An action shall be deemed commenced within the meaning of this article, as to each defendant, at the date of the summons which is served on him, or on a codefendant who is a joint contractor, or otherwise united in interest with him. Where service by publication is proper, the action shall be deemed commenced at the date of the first publication. An attempt to commence an action shall be deemed equivalent to the commencement thereof within the meaning of this article when the party faithfully, properly and diligently endeavors to procure a service; but such attempt must be followed by the first publication or service of the summons within sixty days."

The trouble with that contention is it repeatedly has been held the above statute relates to the commencement of an action and applies only to cases where a statute of limitations is involved. (*Dunlap v. McFarland, Adm'r*, 25 Kan. 488, 491; *Wester v. Long*, 63 Kan. 876, 66 Pac. 1032; *Green v. McCracken*, 64 Kan. 330, 67 Pac. 857; *Brock v. Francis*, 89 Kan. 463, 131 Pac. 1179; *Merchants Transfer & Warehouse Co. v. Ragan*, 170 F. 2d 987, 992.) In the instant case service on appellant was had on the day following the filing of the action. Appellant concedes the action was timely filed against the principal defendant and that the statute of limitations is not involved. The fact the publication service was not commenced against the principal defendant for more than sixty days after the action was filed does not invalidate the service on the principal defendant or on appellant.

The court has examined all cases cited by appellant, and others, on each issue presented. They do not support a judgment of reversal.

The judgment is affirmed.