No. 45,164

Elvin Melton, *Appellant,* v. Donald W. Prickett and General Motors Acceptance Corporation, *Appellees.*

(456 P. 2d 34)

Opinion filed June 14, 1969.

*William H. Stowell,* of Phillipsburg, argued the cause, and *Doris D. Stowell,* was with him on the brief for appellant.

*Thomas C. Boone,* of Hays, argued the cause and was on the brief for appellee Prickett.

*C. Stanley Nelson,* of Salina, argued the cause, and *H. H. Dunham, Jr., E. S. Hampton, John Q. Royce, Howard G. Engleman, Jack N. Stewart, Tom W. Hampton,* and *W. Dean Owens,* of Salina, were with him on the brief for appellee General Motors Acceptance Corporation.

The opinion of the court was delivered by

Fatzer, J.: At issue is the construction and application of K. S. A. 8-135 (c), and particularly subsection (6), with respect to the sale and delivery of a 1962 three-ton used truck-tractor, hereafter re-

ferred to as the truck, where no certificate of title, stating all liens or encumbrances thereon, was assigned to the purchaser at the time of delivery of the truck.

Following initial argument and conference of the court, this case was ordered restored to the docket. In their briefs and on oral argument, counsel was requested to advise the court of their respective views of the law of this state on specific questions propounded. Briefs were filed and reargument was had, and the case now stands for decision.

The story of this controversy commences on January 14, 1964, at the Button Chevrolet Company, Plainville, Kansas. On that date, Button, as seller, sold the truck to Donald W. Prickett, as buyer, and to the plaintiff, Elvin Melton, as co-buyer, for the total time balance price of $8,832.90, to be paid in 30 monthly installments of $294.43, commencing on February 26, 1964. The agreement was reduced to writing on a General Motors Acceptance Corporation retail installment contract, and was signed by Button as seller, Prickett as buyer, and Melton as co-buyer.

The truck had previously been sold to one Donald E. Wise. Wise and Prickett signed a retail installment contract for purchase through Button, which was assigned to GMAC. Later Wise was killed in an accident, and GMAC, with Prickett's approval, placed the truck in Button's garage. By word of mouth, it was made known the truck was for sale. Melton was contacted in Phillipsburg and went to Plainville to talk with Prickett who said he was the owner of the truck. Melton decided to purchase the truck.

Because Prickett was obligated to GMAC on the Wise contract and had necessary credit requirements, he agreed with Melton to pay the difference between the monthly installments of $294.43, which would be due under the GMAC contract, and the sum of $253.73 which Melton was willing to pay.

Prickett and Wise had previously paid $1,525.77 on their contract with GMAC, and that amount was applied as a down payment on the Prickett-Melton contract. No charge was included in the contract for fire insurance and other risks on the truck, but the *seller* or *buyer* were required to furnish satisfactory evidence the truck was adequately covered by such "required insurance." There was no requirement the co-buyer procure such insurance. The contract further provided that insurance settlement should be payable to the

buyer, seller, or seller's assigns, as their interest may appear, and that:

"(b) Proceeds of the aforesaid requirement car insurance, by whomsoever procured, shall be applied toward replacement of the property or payment of this obligation at the option of the seller."

Neither Button nor Prickett purchased insurance to cover fire and other risks on the truck.

GMAC's representative was present during the Prickett-Melton negotiations, and was aware of all transactions concerning the truck, including Melton's agreement with Prickett to purchase the same. He was also aware the registered title to the truck had been issued in the name of Prickett's deceased father, W. L. Prickett, and that his unacknowledged signature was all that appeared on the assignment on the back of the certificate of title. Thus, Button made no assignment of the certificate of title stating the liens and encumbrances thereon, to either Prickett or Melton upon delivery of the truck to Prickett.

On the same day, January 14, 1964, and for value received, Button assigned and transferred all his right, title and interest in the contract to GMAC and authorized it to collect and discharge the same.

Two days later, and on January 16, 1964, Prickett, as seller, and Melton, as purchaser, entered into a written contract designated "Conditional Sales Contract of Personal Property," by which Prickett sold the truck to Melton for the purchase price of $6,500, upon the condition that possession of the truck would be delivered to Melton but title thereto would remain in Prickett until Melton made 30 monthly payments of $253.73, beginning February 26, 1964. When 30 payments had been made in accordance with the contract, Prickett agreed to deliver to Melton "complete and clear title" to the truck. A St. Paul bed and hoist owned by Melton was described in the contract as part of the purchase price. Melton agreed to carry life and health and accident insurance sufficient in the event of his death or disability to pay the unpaid balance of the contract. The sum of $3.73 was included in the monthly payments to purchase such insurance. The contract contained no provision that Melton purchase insurance covering fire and other risks on the truck, nor did it require a loss payable clause in favor of Prickett or GMAC, in the event Melton purchased such insurance. Prickett agreed to make all monthly payments he and Melton were

obligated to make to GMAC, upon the condition Melton regularly made his payments to Prickett, and further, that Prickett would pay off GMAC's lien on the truck at any time Melton paid his obligation in full to Prickett.

Prickett is president and general manager of Prickett & Son, Inc., of Plainville, a Kansas corporation, which is the holder of a certificate of convenience and necessity issued by the State Corporation Commission. It is regularly engaged as a common carrier in the transportation of livestock, grain and other commodities in central and northwest Kansas. In addition to owning its trucks, it leases truck-tractors from others, who in turn operate under its KCC authority.

The record indicates Melton purchased the truck for the purpose of leasing it to Prickett, and for him to qualify financially, Prickett signed the GMAC contract with him. Prickett states the reason the registered title to the truck was placed in the name of W. L. Prickett was to enable Wise, and later Melton, to prorate their truck registration fees with the Motor Vehicle Department, and to permit Prickett & Son's cargo and public liability insurance on file with the State Corporation Commission to be effective on Melton's truck.

Possession of the truck was given to Melton, but Prickett made no assignment of title noting all liens and encumbrances thereon, when he delivered the truck to Melton, as required by 8-135 ($c$). Title was never delivered to Melton.

Thereafter, Melton procured insurance from Hartford Fire Insurance Company covering the truck for fire and other risk for actual cash value. Melton was the sole beneficiary and there was no loss payable clause in favor of either Prickett or GMAC.

The truck was destroyed by fire on December 21, 1964. Prior to the fire, it had an actual cash value of $6,000. Under the terms of its contract, GMAC repossessed the truck, and the court found it had a salvage value of $288. On February 12, 1965, Hartford informed Melton it was not liable for the loss on the ground that, at the time of the fire, the truck was being operated outside the 50-mile radius limit contained in the policy, and it was the subject of a conditional sales contract not specifically described in the policy.

On February 19, 1965, Melton employed Stowell & Stowell as his attorneys to secure a settlement with Hartford. A settlement was achieved and Hartford agreed to pay Melton $3,118.92, upon Melton's payment of an additional premium of $181 for operating

outside the 50-mile limit, to be deducted from Hartford's payment. However, Hartford refused to comply with its agreement with Melton and on January 17, 1966, wrote GMAC, Prickett and Melton no coverage was provided.

On January 25, 1966, Melton commenced this action against Hartford for breach of its contract of settlement, and made GMAC and Prickett parties defendant. On the same date, Melton executed a written retainer with his attorneys stating the terms of the employment, thus creating a lien in their favor (K. S. A. 7-108, 7-109), upon any money paid by Hartford by way of settlement, judgment or otherwise. A copy thereof was duly served upon counsel for the defendants in open court. On a date not disclosed by the record, Hartford paid Melton and his attorneys $3,118.92, which was placed in an escrow account.

In view of conclusions hereafter announced, we deem it unnecessary to detail the various pleadings filed by the parties except to say GMAC's answer and counterclaim alleged the execution of the Button contract on January 14, 1964, a copy of which was attached as Exhibit A, and of its assignment to GMAC; that Prickett and Melton were indebted to GMAC in the sum of $4,122.02 for the unpaid balance thereon, and the prayer was for judgment against Prickett and Melton in that amount. GMAC further prayed for an order giving it a "lien and first right" to the proceeds of any judgment Melton might recover against Hartford, or obtain in a settlement. Prickett's answer and counterclaim alleged the execution of the Prickett-Melton contract on January 16, 1964, and a copy thereof was attached as an exhibit; that as a result of such contract Melton was indebted to him in the sum of $3,805.95 for which he was entitled to recover; that Melton had in his possession the St. Paul bed and hoist which should be delivered to Prickett; that GMAC had a first and prior lien on the proceeds of insurance under Exhibit A, and that any payment made by Hartford to Melton should be paid to GMAC, since it was orally understood by all the parties when the contracts were executed on January 14, and 16, 1964, that Melton would procure fire insurance on the truck. Prickett sought judgment against Melton for the sum of $3,805.95, being the unpaid balance due on the conditional sales contract; for delivery of the St. Paul bed and hoist, and for an order directing that all proceeds from the insurance settlement with Hartford be paid to GMAC to satisfy the terms of the retail installment contract.

Melton's reply denied he executed the contract attached to GMAC's answer and counterclaim; he alleged that both contracts for the sale of the truck executed on January 14, and 16, 1964, were in violation of 8-135 (c) (6), since the certificate of title to the truck was not delivered to the purchaser as required by law; that the contracts were fraudulent and void, and formed no basis for the recovery of any judgment against him.

The district court ordered Melton to pay into court the amount of money he received from Hartford in settlement of his claim, less the sum of $181 he was directed to pay as an additional premium. By agreement of all parties, the action against Hartford was dismissed with prejudice.

Upon trial to a jury, it found that Melton signed the retail installment contract shown as GMAC's Exhibit A. It further found that Prickett had previously and without authority of the plaintiff, gone upon his premises and removed the St. Paul bed and hoist and a dump box frame and cylinder which were the property of Melton, and the jury fixed the value of those items at $1,200.

The district court overruled Melton's motion for a directed verdict against Prickett for the reason the certificate of title to the truck was not delivered to him on January 16, 1964, with the proper assignment thereof, noting the liens and encumbrances thereon, and that Prickett possessed the title with the signature of W. L. Prickett, deceased, on the back of the assignment in blank, all of which was in violation of law, and formed no basis for the recovery against him. It likewise overruled Melton's motion for a directed verdict against GMAC for the same reason.

In substance, the district court rendered judgment in favor of GMAC on its counterclaim, and against Prickett and Melton in the sum of $4,122.02, and held it had a prior lien on the insurance proceeds in the net amount of $2,922.82; that the attorneys' lien of Stowell & Stowell should be denied; that Prickett be given judgment against Melton in the sum of $3,805.95, and that Melton be given judgment against Prickett for the value of the items the jury found to be reasonably worth $1,200.

As indicated, the truck was originally sold to Wise, and Prickett acted as co-buyer to qualify Wise for financing with GMAC. Presumably, Button executed a bill of sale to W. L. Prickett for the new truck (8-135 [c] [3]) rather than to Wise, since the truck was duly registered with the Motor Vehicle Department, and a certifi-

cate of title was issued in the name of W. L. Prickett. But no lienholder was named. Later, and following the death of W. L. Prickett, his unacknowledged signature appeared on the assignment in blank on the back of the certificate of title. Thus, W. L. Prickett, deceased, was the owner of the truck at all times here material.

Following Wise's death, the truck was redelivered to Button by GMAC with Prickett's approval. Later, and on January 14, 1964, Button "sold" the truck to Prickett and Melton, but executed no bill of sale stating the lien or encumbrance thereon when he delivered the truck to Prickett. Two days later, Prickett sold the truck to Melton as heretofore related, but failed to deliver the certificate of title, with an assignment thereof, stating the liens or encumbrances thereon, when he delivered the truck to Melton. Thus, the truck was "sold" twice on a GMAC-Prickett contract and once on a Prickett-Melton contract, all in utter disregard of 8-135 (c) which reads, in part:

"(c) Certificate of title: No vehicle required to be registered hereunder shall be registered or number plates issued therefor, either original issue, or duplicate, unless the applicant for registration thereof shall at the same time present satisfactory evidence of ownership and make application for an original certificate of title for such vehicle.

"(1) Said application for certificate of title shall be made by the owner or his agent upon a blank form to be furnished by the department and shall contain all liens of encumbrances thereon, and such other information as the department may require . . .

"(2) The certificate of title shall contain upon the reverse side a form for assignment of title to be executed by the owner before a notary public or some other officer authorized to administer an oath. This assignment shall contain a statement of all liens or encumbrances of whatever nature and kind thereon at the time of assignment . . .

"(3) Dealers shall execute, upon delivery to the purchaser of every vehicle, a bill of sale stating the lien or encumbrances thereon, in accordance with form prescribed by the commission for all vehicles sold by them . . ."

. . . . . . . . . . . . . .

"(5) It shall be unlawful for any person to operate in this state a vehicle registered under the provisions of this act, or to transfer his title to a vehicle to any person or dealer, unless a certificate of title shall have been issued as herein provided. In the event of a sale or transfer of ownership of a vehicle for which a certificate of title has been issued, the holder of such certificate of title shall endorse on the same an assignment thereof, with warranty of title in form prescribed by the commission and printed thereon and the transferor must deliver the same to the buyer at the time of delivery to him of said vehicle . . .

"(6) It shall be unlawful for any person to buy or sell in this state any

*vehicle required to be registered hereunder, unless, at the time of delivery hereof there shall pass between the parties such certificate of title with an assignment thereof, as herein provided, and the sale of any vehicle registered under the laws of this state, without the assignment of such certificate of title, shall be fraudulent and void."* (Emphasis supplied.)

Subsection (*c*) (5) also provides the specific means for titling a "security interest." (K. S. A. 84-1-201 [37]; 8-126 [*n*].) It does not provide that a title may be "held for ransom," but, rather, that a security interest should be made a part of the title. It reads, in part:

". . . Whenever a person acquires a chattel mortgage on a vehicle subsequent to the issuance of the original title on such vehicle, he shall require the holder of such certificate of title or his agent to surrender the same and sign an application for a mortgage title in form prescribed by the department and upon such surrender, shall immediately deliver said certificate of title, application, and a fee of one dollar ($1) to the department. Upon receipt of the said certificate of title, application, and fee, the department shall, without delay, issue a new certificate of title showing the liens or encumbrances so created . . ."

Where the legislature speaks upon a particular subject over which it has constitutional power to legislate, public policy is what the statute enacts. (*State, ex rel., v. Anderson,* 195 Kan. 649, 408 P. 2d 864.) And so with the Registration of Motor Vehicles Act. Section 8-135 specifically regulates the registration, transfer, and sale of motor vehicles and its provisions are written into the contract for the sale of every vehicle in this state. The statute is both remedial and penal or punitive in nature. Its violation is made a criminal offense (K. S. A. 8-142, 8-149), and a sale of a vehicle in violation of its terms is declared fraudulent and void. In *Elrod v. Preferred Risk Mutual Ins. Co.,* 201 Kan. 254, 440 P. 2d 544, it was held:

"The act or omission made unlawful by K. S. A. 8-135 (*c*) (6) and which renders a sale fraudulent and void is the delivery of the vehicle to the purchaser without assignment of the certificate of title." (Syl. ¶ 1.)

This court has held that the provisions of the statute are mandatory in their requirements and are to be literally interpreted and strictly enforced to render void all sales of motor vehicles required to be registered, where no certificate of title with an assignment thereof, containing a statement of all liens or encumbrances thereon, is not delivered by the seller to the purchaser at the time of the delivery of the vehicle. In *Maryland Cas. Co. v. American Family Insurance Group,* 199 Kan. 373, 429 P. 2d 931, it was said:

". . . [E]ven if a buyer is a conditional vendee, and thus is an 'owner' as defined by the statute, that fact does not free him or the vendor from the regulatory provisions of the act relating to registration, sale and transfer of a

motor vehicle. For example, not only are the parties subject to K. S. A. 8-135 (c) (6), but also to K. S. A. 8-135 (c) (2), specifying an assignment of certificate of title shall contain a statement of all liens or encumbrances of whatever nature and kind; K. S. A. 8-127, requiring every 'owner' to secure registration of a motor vehicle intended to be operated in this state; and K. S. A. 8-135 (c), compelling the new 'owner' to present either a bill of sale, if the motor vehicle is new, or a certificate of title properly endorsed by the seller, if the vehicle is a used one, in order to register the vehicle.

"Since the enactment of what is now K. S. A. 8-135 (c) (6) (L. 1937, ch. 72, § 5), we have numerous decisions holding that the statute means just what it says, and failure to comply therewith renders the sale of an automobile fraudulent and void . . ." (l. c. 378, 379.)

The purpose of the statute is to require the issuance of a certificate of title for every vehicle required to be registered under the Act (*Wilcox Trailer Sales, Inc. v. Miller,* 200 Kan. 315, 320, 436 P. 2d 860), and to provide a means whereby one may readily ascertain who is the owner of a motor vehicle, thus protecting the public from the evils arising from the unregulated use, transfer and sale of such a vehicle. In *Maryland,* supra, it was further said:

". . . The statute was enacted not only to protect the public against fraud and prevent traffic in the sale of stolen automobiles but also to lend stability and certainty in the business climate surrounding each transaction . . ." (l. c. 379.)

GMAC and Prickett rely upon *Crow v. Hershberger,* 170 Kan. 492, 226 P. 2d 846. The case before us does not fall within the rule of that case. That was an action involving possessory rights to a motor vehicle (*Maryland,* supra), and it was held that one whose name was not on the certificate of title and who had a valid interest in the vehicle was not barred from asserting ownership because title was in another. But, see, *Stebbins v. Heidebrecht,* 186 Kan. 484, 350 P. 2d 783.

As we have seen, a certificate of title was issued for the truck in question. Under the provisions of 8-135 (c) (5), it was unlawful to sell or transfer ownership of the truck without the holder of such certificate of title assigning and delivering the title to the purchaser at the time of delivery of the vehicle. There is no contention that was done. Likewise, subsection (6) made the purported sale of the vehicle by Button to Prickett, represented by the contract assigned to GMAC, fraudulent and void, and also made the purported sale of the truck by Prickett to Melton fraudulent and void. In *Roddy v. Hill Packing Co.,* 156 Kan. 706, 137 P. 2d 215, it was said:

"It is elementary law that a contract obligating the parties or either of them to violate a penal statute is unenforceable and void; and the breach of such contract is *damnum absque injuria*—a matter for which the law provides no redress. A long line of well-considered cases has committed this court to the rule that where a statute expressly provides a violation thereof shall be a misdemeanor, a contract made in direct violation of the same is illegal and there can be no recovery thereon although such statute does not in express terms prohibit the contract or pronounce it void. (*Setter v. Alvey,* 15 Kan. 157; *Ainsworth v. Miller,* 20 Kan. 220; *Pinney v. Bank,* 68 Kan. 223, 75 Pac. 119; *Ridgway v. Wetterhold,* 96 Kan. 736, 153 Pac. 490; *Thacher v. Smith,* 103 Kan. 641, 175 Pac. 983; *Morris v. Firemen's Ins. Co.,* 121 Kan. 482, 247 Pac. 852; *School District v. Roanoke State Bank,* 126 Kan. 122, 267 Pac. 35; *Ewing v. Halsey,* 127 Kan. 86, 272 Pac. 187; *Bourbon County Comm'rs v. Miller,* 132 Kan. 52, 294 Pac. 863; *National Bank v. White,* 133 Kan. 490, 1 P. 2d 257; *Cook v. Donner,* 145 Kan. 674, 66 P. 2d 587.)"   (l. c. 715.)

GMAC stands in the shoes of Button, and it has no greater right to enforce its contract than has Button. (*General Motors Acceptance Corp. v. Davis,* 169 Kan. 220, 218 P. 2d 181, 18 A. L. R. 2d 808.) Giving the provisions of the statute a literal and mandatory interpretation, we must hold that neither GMAC nor Prickett has any lawful right to the fruits of an unlawful contract and cannot recover the unpaid purchase price alleged to be due thereon. The district court should have dismissed the counterclaims of both GMAC and Prickett. When an action has been brought on a contract and during the course of the trial it becomes apparent that the contract sued on is in violation of law, it is the duty of the district court to dismiss the action. (*Sage v. Oil Country Specialties Mfg. Co.,* 138 Kan. 501, 27 P. 2d 542; *Ditzen v. Given,* 139 Kan. 506, 32 P. 2d 448; *Brumm v. Goodman,* 164 Kan. 281, 286, 188 P. 2d 913.)

It is conceded by the parties that Melton had an insurable interest in the truck when he procured the fire insurance policy from Hartford. (*Weaver v. Hartford Fire Ins. Co.,* 168 Kan. 80, 211 P. 2d 113; *Maryland Cas. Co. v. American Family Insurance Group,* supra.) But the point becomes immaterial because Hartford, following the commencement of Melton's action, paid him the amount agreed upon to settle the litigation, and all parties agreed to Hartford's dismissal from the action with prejudice.

GMAC argues that if the contract assigned to it is declared fraudulent and void (8-135 [c] [5] and [6]), it is nevertheless entitled to a lien and first right to the proceeds of the insurance settlement. As indicated, the contract contained language that proceeds

of required insurance, by whomsoever procured, should be applied toward payment of the obligation. It argues it is entitled to have the insurance provisions of its contract enforced, and that the court rightly ordered the proceeds applied to its obligation. We do not agree.

Where the complaining party can establish his claim without relying on the illegal transaction, it is the general holding of courts that he can recover; but if it requires the aid of the illegal contract or transaction, he cannot. (*Surety Co. v. Brick Co.,* 73 Kan. 196, 84 Pac. 1034; *Ridgway v. Wetterhold,* 96 Kan. 736, 153 Pac. 490.) GMAC's contract is entire. It cannot stir a step but through its fraudulent and void contract (8-135 [*c*] [5] and [6]), and it cannot enforce its claim to the insurance proceeds. In order to maintain such a claim, it was necessary to allege and prove the illegal contract, which, from the facts alleged and admitted, was unlawful and fraudulent and void. A contract which is fraudulent and void by statute and prohibited by law, may not be used as the basis of recovery in an action by a party who acquired his rights with full knowledge of the facts which rendered the contract fraudulent and void. It is futile to say that conduct of GMAC, which is unlawful and the road to prison on the criminal side of the court, may be made lawful on the civil side of the court, and entitle it to the proceeds of Melton's independent contract with Hartford.

Melton contends the district court erred in holding he had no recourse against Prickett for his alleged fraud. Melton sought to recover the sum of $3,750, being the amount paid Prickett under the Conditional Sales Contract. The point is not well taken. Melton's purported claim for relief was made more than two years after January 16, 1964, and it was barred by the statute of limitations. (*Gurley v. Broadway Sales Co.,* 184 Kan. 179, 334 P. 2d 312, Syl. ¶ 3.)

The judgment of the district court is reversed with directions to dismiss the counterclaims of GMAC and Prickett and to set aside GMAC's judgment against Prickett and Melton, and Prickett's judgment against Melton, since they were based upon fraudulent and void contracts. The district court is further ordered to ascertain the amount due Stowell & Stowell by reason of their attorneys' lien, which is conceded to be sufficient both in terms of employment and service of the lien, and to enforce the same; to sustain the judgment

entered in favor of Melton and against Prickett, and to proceed in accordance with the views expressed in this opinion.

It is so ordered.

FONTRON, J., concurs in the result.

PRICE, C. J., dissents.