No. 47,987

Rozann Gicinto, d/b/a C & R Sales, *Appellee*, v. Credithrift of America, No. 3, Inc., *Appellant*.

(549 P. 2d 870)

Opinion filed May 8, 1976.

*Robert J. Fleming*, of Weir, Angwin and Towner, of Pittsburg, argued the cause and was on the brief for the appellant.

*Charles Menghini*, of Menghini and Menghini, of Pittsburg, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

Foth, C.: This is an action in replevin by Rozann Gicinto, a used car dealer in Kansas City, Missouri, to recover three automobiles from the defendant, Credithrift of America, No. 3, Inc., a finance company with offices in Pittsburg, Kansas. The trial court gave plaintiff possession of the two cars still held by the defendant at the time of trial, plus $4,500 in damages for the wrongful detention of all three. The defendant has appealed.

In early 1973 the plaintiff, Mrs. Gicinto, operated her business through her husband Charles, who bought and sold cars for her. During the year prior to that time the Gicintos had developed a trading relationship with one James Norman, another used car

dealer who operated in Lamar, a town in southwest Missouri not far from the Kansas line. The Gicintos bought a few trucks from Norman, and Norman bought numerous cars from the Gicintos.

Norman's purchases were made according to an established routine: He would go to plaintiff's lot in Kansas City, pick out the cars he wanted to buy, negotiate a price, and drive or have them driven to his lot in Lamar. For the purchase price of each car he gave the Gicintos a check drawn on his bank in Jasper, Missouri. Plaintiff would attach each check to the certificate of title to the corresponding car, duly assigned, and forward it through her bank to Norman's bank for collection. When Norman made appropriate arrangements with his bank to cover a check, that bank would remit its amount to plaintiff's bank and release the certificate of title to Norman.

In February and March, 1973, Norman bought 26 cars from the Gicintos under this arrangement. Among them were the three cars involved in this lawsuit: a 1972 Chevrolet sedan purchased on February 4, 1973, for $1,900; a 1972 Ford sedan on March 5, 1973, for $1,800; and a 1972 Chevrolet station wagon on March 13, 1973, for $2,800. Each assigned certificate of title with check attached was forwarded to Norman's bank in the usual manner, but none of the three checks was honored and none of the three certificates of title was ever delivered to Norman.

When summer came and these checks among others had not been paid, Charles Gicinto began looking for his cars. An undetermined number had been sold by Norman to customers in a four state area. He found that each of these three cars had been promptly sold by Norman to a customer who had financed his purchase with the defendant Credithrift. Further, each buyer had defaulted on his loan within three or four months, and Credithrift had repossessed the cars. At least one of them was picked up at Norman's used car lot, and all three were stored on a used car lot in Pittsburg.

In each case Credithrift had made a loan to the car buyer and had taken a note and security agreement. Since the plaintiff's certificates of title never left Norman's bank in Jasper, it is apparent that Credithrift's lien was never endorsed on any of those certificates. Credithrift's manager testified that in the case of trustworthy dealers (like Norman) Credithrift would make the loan proceeds check payable jointly to the car buyer and seller, with a "rubber stamp" on the back requiring the dealer to endorse Cred-

ithrift's lien on the certificate of title before delivering it to the buyer. In any event, Credithrift stipulated at trial that it is at best an "unperfected secured creditor" of each of the three buyers.

In late 1973 Charles Gicinto talked to the Credithrift manager in Pittsburg, saying he wanted the three cars. The manager said in turn that Credithrift wanted the titles and would pay for the cars. After some negotiations it appeared that Credithrift wouldn't pay for the cars unless Gicinto furnished an affidavit from Norman—the exact nature of which is unclear. Gicinto consulted counsel, and this suit was the result. Credithrift answered that its possession was lawful because of its security interest in the cars, and counterclaimed for the titles and damages for the depreciation of the cars.

The case was tried to the court in December, 1974. The witnesses were plaintiff's husband Charles Gicinto, the current Credithrift manager, and Richard Ham, a used car dealer in Pittsburg. Ham had had the Ford and Chevrolet sedans on his lot since Credithrift repossessed them in late June, 1973. He also had personally purchased the Chevrolet station wagon from Credithrift for $1,150 in November, 1973.

Ham valued the other two cars at about $900 to $1,000 when they were first put on his lot in mid-1973. Their present value (December, 1974) he put at $600 to $700 each. They had depreciated, he said, $250 to $300 apiece in the year and a half he had had them. All three, he said, were high mileage cars having respectively 98,000, 103,000 and 127,000 miles on them when he first saw them.

The trial court reached the following conclusions:

"1) That no title to the 1972 Chevrolet Biscayne automobile, the 1972 Ford Torino and the 1972 Chevrolet station wagon involved in this action, passed to James Norman.

"2) That the sale of vehicles without the assignment of the Certificate of Title is void.

"3) Where an agreement is made for sale of personal property and delivery is made, the seller has a right against the buyer or against an attaching creditor, to reclaim the property if the buyer fails to pay for the personal property.

"4) That Defendant's rights are based upon the title of James Norman. James Norman having never obtained title and having no right to the vehicles, the Defendant had no right to the possession of said vehicles and could not perfect a lien on said vehicles."

The court's findings as to title are obviously based on K. S. A. 8-135 (c) (6), which provides in substance that the sale of an

automobile without the delivery to the buyer of an assigned certificate of title is "fraudulent and void." In such a case, title remains in the seller. *Melton v. Prickett*, 203 Kan. 501, 456 P. 2d 34; *Elrod v. Preferred Risk Mutual Ins. Co.*, 201 Kan. 254, 440 P. 2d 544; *Bankers Investment Co. v. Meeker*, 166 Kan. 209, 201 P. 2d 117. The applicable Missouri statute, 15B V. A. Mo. Stat. § 301.210, is closely parallel to our 8-135 (c) (6), providing that "the sale of any motor vehicle or trailer registered under the laws of this state, without the assignment of such certificate of ownership, shall be fraudulent and void."

On appeal Credithrift at first attacked these findings, contending that Norman's delivery of his checks to plaintiff constituted "payment" of the purchase price so that title passed to Norman under the principles set out in *Elrod v. Preferred Risk Mutual Ins. Co.*, supra. We there held that where a car title was duly assigned and attached to a draft for delivery on collection, title passed when the seller received the purchase price. We there distinguished *Laughlin Motors v. Universal C. I. T. Credit Corp.*, 173 Kan. 600, 251 P. 2d 857, which held that in a sale "for cash," title does not pass until the seller receives payment. In *Laughlin* it was further observed that when a check is dishonored when presented there is no payment, title does not pass, and the seller can maintain replevin against the buyer or a third party who is not an innocent purchaser. The Uniform Commercial Code is in accord, K. S. A. 84-2-511 (3) providing that "payment by check is conditional and is defeated as between the parties by dishonor of the check on due presentment."

On oral argument counsel for Credithrift recognized the force of the foregoing authorities and now concedes that title never passed to Norman. The result is that Credithrift couldn't acquire a security interest in any of the cars, since K. S. A. 84-9-204 (now K. S. A. 1975 Supp. 84-9-203) required the debtor to acquire an interest in the collateral before a security interest could attach. See, 4 Anderson, Uniform Commercial Code (2d ed.), § 9-204:7. The security agreement was thus unenforceable even as between the signatories. *Texas State Bank v. Foremost Insurance Company*, 477 S. W. 2d 652 (Tex. Ct. Civ. App. 1972); 1972 Official Comment 5 to § 9-203, 3 U. L. A.-U. C. C., 1975 Supp. at 232.

Credithrift now bases its claim as to title on a contention that plaintiff made an "election of remedies." This claim is based in part on the fact that Charles Gicinto filed a criminal complaint in

Missouri against Norman charging him with violation of the Missouri bad check laws. We are at a loss to see how this constitutes an election of remedies. Whether or not Norman committed a criminal offense by giving worthless checks to the Gicintos has no bearing we can see on who has title to or the right to possession of the cars.

Neither can we find a fatal inconsistency between plaintiff's position here that she owns the cars and Charles Gicinto's testimony that Norman has never paid any part of the $6,500 purchase price of the three cars and "still owes me the full amount." That testimony strikes us as no more than the normal reaction of an unpaid seller. The mere possibility that plaintiff may assert some sort of claim against Norman at some future time is not inconsistent with this action to recover plaintiff's property from one having no interest in it. We therefore hold that there has been no "election of remedies" which would preclude plaintiff from asserting her title here.

Finally, Credithrift asserts that the trial court's $4,500 damage award is not supported by evidence. The measure of damages, it is agreed, is the value of the cars when it took possession in June, 1973, less the current value of the two cars returned by it. *Russell v. Smith,* 14 Kan. 366; *Motor Co. v. Kline,* 109 Kan. 227, 231, 198 Pac. 949. Credithrift says the only evidence of value is Ham's testimony recited above.

Credithrift overlooks the testimony of Charles Gicinto that the $6,500 total purchase price in February and March, 1973, was a fair wholesale price for cars just over a year old—high mileage and all. Further, Credithrift lent $6,510.00 on the station wagon and some unidentified household goods; $6,889.63 on the Ford sedan and a 1972 Ford station wagon; and $4,507.56 on the Chevrolet sedan and a 1967 Dodge. The trial court doubtless, and with some justification, took a skeptical view of Credithrift's evidence of value. It seems highly unlikely that the cars were worth only about $1,000 apiece in June, 1973, when three or four months earlier Credithrift was willing to lend almost $18,000 on collateral of which they formed by far the major part. The same skepticism may well have met the profession of Credithrift's manager that the value of a borrower's collateral has no bearing on how much Credithrift will lend.

The problem was to determine the cars' depreciation. We are not favored with the trial court's reasoning, but our own rough

and ready calculations lead to an average depreciation rate of about $50-$55 a month per car for the 21 to 22 months from first sale to trial. That is to say, the two remaining cars sold initially for $3,700, and at time of trial were worth about $1,400. Assuming the three together were worth the $6,500 sale price in February and March and were depreciating at $165 per month, when Credithrift first took possession in June they would have been worth around $5,840. Since the two cars returned were, by Credithrift's testimony, worth at most $1,200 to $1,400, the balance would roughly approximate the $4,500 awarded.

We have no way of telling whether our calculations track with those of the trial court, but they do demonstrate that the damages awarded are not beyond the bounds of the evidence adduced. That being so, the judgment will not be disturbed.

Affirmed.

APPROVED BY THE COURT.