(96 P.3d 272)

No. 89,948

Ed Bozarth Chevrolet, Inc., *Appellee*, v. Charnita E. Black, *Appellant.*

Opinion filed September 26, 2003.

*Fred W. Schwinn*, of Consumer Law Center, P.A., of Livermore, California, for the appellant.

*Kevin D. Weakley*, of Wallace, Saunders, Austin, Brown and Enochs, Chtd., of Overland Park, for the appellee.

Before Malone, P.J., Pierron and Green, JJ.

Pierron, J.: Ed Bozarth Chevrolet, Inc., (Bozarth) filed a replevin action against Charnita E. Black for return of a Chevrolet Venture Van. Black was not approved for financing and would not return the van. Black counterclaimed alleging breach of contract, fraud, and violations of federal law and the Kansas Consumer Protection Act (KCPA), K.S.A. 50-623 *et seq*. The trial court granted summary judgment in favor of Bozarth and ordered return of the van. The court denied summary judgment to Black on all her claims

except for one alleged KCPA violation. This court granted leave for an interlocutory appeal.

For the most part, the parties do not dispute the facts in this case. On July 23, 2001, Black went to Bozarth to purchase a new van. She spoke with Morris James, a Bozarth salesman, about purchasing a 2001 Chevrolet Venture Van. Black testdrove the van and decided she wanted to purchase it. Black and James negotiated what type of financial commitment Black could afford. Ultimately, Black said she could afford a $500 down payment and that Bozarth would agree to finance the transaction for 60 months with a monthly payment of $469. Black testified that she repeatedly voiced her concern that she would probably not qualify for the special lower interest rate (.9%), which allowed for the $469 payment, because of her bad credit history.

After paying the $500 and filling out a credit application, Black was allowed to use the van to take her son to a baseball game and then return to complete the necessary paperwork. When Black returned to the dealership, she met with Al Gallegos, a business manager for Bozarth. Black signed multiple documents including a buyer's order, a retail installment sale contract, a vehicle ownership transfer agreement, a Kansas 30-day temporary permit, an agreement to provide accidental physical damage insurance, a "We Owe - You Owe" agreement, and a spot delivery agreement.

Black testified that when she left the dealership, she felt like the van was completely hers. She said that both James and Gallegos congratulated her on the new purchase, she had both sets of keys, she received free car wash certificates, and the van's On-Star service was activated.

The day after the sale, July 24, 2001, Gallegos called Black and told her GMAC did not approve her financing at the agreed terms. Gallegos said that GMAC would only approve the financing at a higher interest rate which equated to higher payments for Black. Both James and Gallegos called Black over the next several days trying to negotiate with her. After Black informed Gallegos that she would not be able to make the payments under the higher interest rate financing, he asked her to return the van and she refused.

Bozarth filed a replevin action seeking return of the van. The trial court conducted a hearing on possession of the van. The court found there was not a valid financing agreement and ordered Black to return the van to Bozarth in return for her $500 down payment. Black filed counterclaims against Bozarth alleging violations of the Federal Odometer Act, the Truth in Lending Act, and the Kansas Consumer Protection Act and for breach of contract and fraud.

The trial court decided the case on summary judgment and granted summary judgment to Bozarth on the replevin claim, finding there was not a completed sale of the van and that Bozarth was entitled to replevin. The court denied all of Black's claims except for the issue of whether James and/or Gallegos told Black that her financing had been approved at the lower interest rate (.9%) as a violation of the KCPA. The trial court granted leave for an interlocutory appeal.

Black argues the trial court failed to make findings of fact and conclusions of law in its memorandum decision as required by Kansas Supreme Court Rule 165 (2002 Kan. Ct. R. Annot. 200), K.S.A. 2002 Supp. 60-252(a), and K.S.A. 2002 Supp. 60-256(d).

Supreme Court Rule 165 provides that in contested matters submitted to a judge without a jury, the judge shall state the controlling facts required by K.S.A. 60-252 and the legal principles controlling the decision. The memorandum decision in this case is 16 pages long. *Cf. Brown v. Wichita State University P.E.C., Inc.*, 217 Kan. 661, 538 P.2d 713 (1975) (court's judgment was a one-sentence order). Black's disagreement is with the judge's statement that "[t]he statement of uncontroverted facts for this decision is adopted as set forth by the parties in their respective Memoranda in Support of Motions for Summary Judgment." The judge then integrated all the necessary facts into his lengthy conclusions of law. Black did not object to the memorandum decision in the court below.

Meaningful appellate review is precluded where a trial court's findings of fact and conclusions of law are inadequate to disclose the controlling facts or basis for the court's findings. However, in the absence of any objection to the inadequacy of the trial court's ruling, the reviewing court will presume the trial court found all

facts necessary to support the judgment and an omission in findings will not be considered. *Tucker v. Hugoton Energy Corp.*, 253 Kan. 373, 378, 855 P.2d 929 (1993). In this case it is unnecessary to presume the trial court found all facts necessary to support the judgment because the court integrated the facts into its conclusions of law. See *Blair Constr. Inc. v. McBeth*, 273 Kan. 679, 688, 44 P.3d 1244 (2002). Black also failed to raise this issue in the trial court and give the court the opportunity to correct its judgment.

Next, Black argues the trial judge refused to consider the disputed factual issues raised in this case. Rather, she contends the trial judge used his own personal car-buying experience instead of the facts in the case, manufactured his own set of facts based on his preconceived idea of resolving the case, and completely discounted her version of facts surrounding the execution of the documents and her belief that the sale was consummated, not conditional. Black argues the trial court invaded the province of the jury in making these factual conclusions.

The standard of review for a motion for summary judgment is well established:

" 'Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. [Citation omitted.]' " *Mitchell v. City of Wichita*, 270 Kan. 56, 59, 12 P.3d 402 (2000).

Black argues the trial court presumed that she knew the sale of the car was conditioned upon third-party financing despite her testimony to the contrary and her testimony that she would not have taken possession of the car if informed of the conditional sale. She also states it was undisputed that she did not receive a copy of the spot delivery agreement when she left the dealership and it was

faxed to her 3 days after the sale. Black takes issue with several comments by the trial judge. First, at the summary judgment hearing, the trial judge made the general statement that

"it is also my personal experience in buying vehicles that that's how you buy a new car. Unless you have the cash and a checkbook there for twenty thousand some odd dollars. That's how I bought my last car. . . I bought my vehicle in Kansas City, Kansas so I know that at least spot delivery was how I bought my vehicle down there."

Black contends the trial court also manufactured facts where there was no evidence presented on the issue. Black cites the court's journal entry where the court commented on the amendments to the manufacturer's statement of origin (MSO) statute, K.S.A. 2002 Supp. 8-135, extending the time for delivery of the MSO: "These amendments are consistent with time frames necessary to complete the conditions on the sale of a vehicle as motor vehicle purchases have become more complex and more commonly contingent." The court stated: "[S]pot delivery agreements are a commonly recognized way to streamline the sales process creating a less burdensome transaction for the buyer and the seller."

Bozarth argues the trial court's finding that Black was aware that the sale of the van was conditioned on financing approval was based on the court's examining of all the documents signed by Black. The court stated that Black knew the price of the van and that the money to pay for the van had to come from somewhere. Bozarth also states that the judge's comments on his own car-buying experience were simply to get a better understanding of the spot delivery agreement used in this case and there is no mention of the judge's car-buying experience in the court's memorandum opinion. Bozarth states that the trial court was within its power of judicial notice in stating that motor vehicle purchases have become more complex and more commonly contingent, and that spot delivery streamlines the sales process. See K.S.A. 60-409(b)(3); *In Re Estate of Carlson*, 187 Kan. 543, 547, 358 P.2d 669 (1961) (court took judicial notice of the difficulties experience by small Kansas communities in securing medical doctors).

Black contends the spot delivery agreement purports to wreck an otherwise valid, consummated, and completed transaction, is

ambiguous, is not referenced in any other document, does not evidence mutual assent, and provides unilateral rescinding power in Bozarth. Black argues the trial court gave undue weight to the spot delivery agreement in light of all the other documents that provided for a completed sale of the vehicle. Bozarth responds that when viewing all the documents of this transaction, it is clear that there was an offer by Black to purchase the vehicle from Bozarth, but the sale was not complete until financing was approved.

Black contends the spot delivery agreement contains unbargained for and unknown terms in a standardized agreement which are beyond the range of reasonable expectation of a Kansas car buyer. See *Darner Motor Sales v. Universal Underwriters*, 140 Ariz. 383, 391, 682 P.2d 388 (1984) (customers are bound by standardized agreements even without knowing the terms in detail, but not bound by unknown terms beyond the realm of reasonable expectations); Restatement (Second) of Contracts § 211 (1981).

The trial court found the terms of the spot delivery agreement were not beyond reasonable expectations and cited provisions of the Restatement (Second) of Contracts. Black argues:

"No Kansas consumer purchasing a new vehicle would expect that once all the paperwork was completed and signed (including a state approved form which states that the transaction is consummated and completed), the dealership's finance manager told the consumer that their credit was approved, the salesman shook the consumer's hand and congratulated them on the purchase of their new vehicle, the consumer took delivery of the vehicle, and the consumer drove the vehicle home under the authority of a Kansas temporary 30-day license permit, that the vehicle dealer would be able to telephone the consumer the next day and demand that the consumer agree to less favorable financing terms or the return of the purchased vehicle."

We agree with the trial court's characterization of the expectations in this case that a reasonable person who does not have the money to pay for a vehicle at the time of purchase would assume that a vehicle which is driven off the lot, contingent on financing approval, would have to be returned if the financing was not approved. The trial court stated it would be unreasonable to assume that if financing was not approved, the person in possession of the vehicle could keep it with no further obligation to pay. Further,

Black knew the extent of her own credit history and that it might be difficult for her to qualify for financing. It should have come as no surprise to Black that she was denied.

The trial court did not err in granting summary judgment. Like the trial court, we have examined the totality of the evidence and the documents and contracts signed by Black and find the transaction was never consummated due to the inability of Bozarth to obtain financing at the agreed terms. A court may ascertain the existence and terms of an agreement from a combination of written instruments and the acts of the parties in connection therewith. *Reznik v. McKee, Trustee*, 216 Kan. 659, 673, 534 P.2d 243 (1975).

The primary rule in interpreting written contracts is to ascertain the intent of the parties. If the terms of the contract are clear, there is no room for rules of construction, and the intent of the parties is determined from the contract itself. See *Marquis v. State Farm Fire & Cas. Co.*, 265 Kan. 317, 324, 961 P.2d 1213 (1998). The trial court granted summary judgment, finding there was no genuine issue as to any material fact concerning the execution of the documents and contracts. The spot delivery agreement made the sale conditional and references the financing conditions of the purchase. The spot delivery agreement is clear and unambiguous. "Unambiguous contracts are enforced according to their plain, general, and common meaning in order to ensure the intentions of the parties are enforced. [Citation omitted.] The intent of the parties is determined from the four corners of an unambiguous instrument, harmonizing the language therein if possible. [Citation omitted.]" *Hall v. JFW, Inc.*, 20 Kan. App. 2d 845, 848, 893 P.2d 837 (1995). If financing is approved, the sale is consummated. If the financing is rejected, then Black is responsible for returning the van immediately to Bozarth.

We also find that Black has not set forth any evidence that the trial court based its decision on anything other than the contract evidence in the case or that genuine issues of fact material to this decision still remain. See *Mitchell v. City of Wichita*, 270 Kan. 56, 59, 12 P.3d 402 (2000) (A disputed question of fact which is immaterial to the issue does not preclude summary judgment.). While the judge commented on his own car-buying experience at the

hearing, gave his perceived rationale why the MSO delivery time has been extended to 30 days in K.S.A. 2002 Supp. 8-135(c)(3), and suggested that the spot delivery agreement is a common way to streamline the sales process, there is no evidence that those comments directed his decision, prejudiced his decision one way or the other, or improperly invaded the province of the jury. See *Mastin v. Kansas City Power & Light Co.*, 10 Kan. App. 2d 620, 706 P.2d 476 (1985) (quoting *Fisher v. Shamberg*, 624 F.2d 156, 162 [10th Cir. 1980]) (" '[s]ummary judgment should not be used to prevent the necessary examination of conflicting testimony and credibility in the crucible of a trial' ").

Additionally, whether Black knew the sale of the car was conditioned upon third-party financing, she would not have taken possession of the car if informed of the conditional sale, or the undisputed evidence showed that she did not receive a copy of the spot delivery agreement until 3 days after the transaction, these do not create issues of material fact for the questions resolved on summary judgment. A party to a contract has a duty to read the contract before signing it, and the failure to read a contract does not make the contract less binding. *Miner v. Farm Bur. Mut. Ins. Co., Inc.*, 17 Kan. App. 2d 598, 609, 841 P.2d 1093 (1992), *rev. denied* 252 Kan. 1092 (1993).

Next, Black argues the trial court erroneously interpreted K.S.A. 2002 Supp. 8-135(c)(3) and K.S.A. 8-2402 as they apply in this case.

"Interpretation of a statute is a question of law, and [an] appellate court's review is unlimited." *Williamson v. City of Hays*, 275 Kan. 300, 305, 64 P.3d 364 (2003).

K.S.A. 2002 Supp. 8-135(c)(3) provides in relevant part:

"Dealers shall execute, upon delivery to the purchaser of every new vehicle, a manufacturer's statement of origin stating the liens and encumbrances thereon. Such statement of origin shall be delivered to the purchaser at the time of delivery of the vehicle or at a time agreed upon by the parties, not to exceed 30 days, inclusive of weekends and holidays."

Black states the 30-day period in K.S.A. 2002 Supp. 8-135(c)(3) facilitates the use of spot delivery agreements by car dealerships and the ability to "yo-yo" the consumer into higher financing. In the next breath, she argues the use of a spot delivery agreement

violates K.S.A. 2002 Supp. 8-135(c)(3) because the Department of Revenue's "Model Vehicle Ownership Transfer Agreement" says that a sale is "consummated and completed" on the date the form is executed and therefore a sale cannot be subject to any conditions. Black contends that by selling a vehicle and deliberately withholding the MSO from the purchaser, the dealer intentionally violates K.S.A. 2002 Supp. 8-135(c)(3).

Black cites multiple cases in support of her argument that while no Kansas cases have addressed a spot delivery agreement, they stand for the position that car dealers cannot engage in the conditional sale and delivery of motor vehicles without violating K.S.A. 2002 Supp. 8-135(c)(3): *Melton v. Prickett*, 203 Kan. 501, 456 P.2d 34 (1969); *Wilcox Trailer Sales, Inc. v. Miller*, 200 Kan. 315, 436 P.2d 860 (1968); *Maryland Cas. Co. v. American Family Insurance Group*, 199 Kan. 373, 429 P.2d 931 (1967); and *General Motors Acceptance Corp. v. Davis*, 169 Kan. 220, 218 P.2d 181 (1950). None of the cases cited by Black are directly on point.

In *Maryland*, the court found the parties' transaction violated K.S.A. 8-135(c) since they agreed the title to the vehicle would not be passed until the promissory note was paid in full in contravention of the requirement in K.S.A. 8-135(c) that title be transferred on delivery of the vehicle. 199 Kan. at 380. The court in *Melton* reached a similar conclusion of violating K.S.A. 8-135(c) where the parties conditioned the sales contract that seller would retain the title to the vehicle until the buyer had made the first 30 payments of the contract. 203 Kan. at 509. In *General Motors*, Black relies on dicta where the court contemplated: "We need not discuss nor decide whether under the present motor vehicle act, it is possible for an individual, as distinguished from a dealer purchasing from a wholesaler, to execute a valid conditional sales contract on a motor vehicle." 169 Kan at 224. We do not find *General Motors* persuasive—the language was dicta, and the law relied upon was that in effect in 1950.

In *Wilcox*, the court considered a sale of a mobile home where the dealer did not issue a bill of sale at the time of delivery. The *Wilcox* court struck down the sale as violating K.S.A. 8-135(c)(6).

Black relies on language in the *Wilcox* decision where the court quoted part of the district court's findings:

" 'K.S.A. 8-135(c)(5) and (6) makes it absolutely mandatory that when a motor vehicle is sold that a certificate of title pass from the seller to the buyer. It makes no exceptions for a conditional sale and, unlike the uniform law, there are no exceptions to the Kansas law. It says that such a sale as we have in this case is fraudulent and void.' " 200 Kan. at 318.

As the trial court correctly explained, *Wilcox* is distinguishable and spot delivery agreements do not violate today's version of K.S.A. 8-135. First, the quoted language in *Wilcox* was from the lower court's decision. Second, as with all the other authority cited by Black, K.S.A. 8-135(c), at the time of *Wilcox*, required transfer of title to the buyer at delivery and is different than the current version of K.S.A. 2002 Supp. 8-135(c)(3) which permits 30 days to deliver the MSO. Third, K.S.A. 2002 Supp. 8-126(n), the definition section of the Motor Vehicles Act, specifically recognizes the possibility of a conditional sale by defining "Owner" as a person

"who holds legal title of a vehicle, or in the event a vehicle is the subject of an agreement for the conditional sale thereof with the right of purchase upon performance of the conditions stated in the agreement and with an immediate right of possession vested in the conditional vendee."

Black further argues there is no legitimate business reason for a vehicle dealer to use a spot delivery agreement in the sale of a motor vehicle. She contends the agreement is either a deceptive sales technique to close a deal and ensure against buyer's remorse while financing is being arranged or it is an overreaching sales technique to allow the dealership to "squeeze more profit out of the customer." Black's solution is for the dealership to tell the customer that it will not sell the vehicle until the financing is finalized and if the dealer wants to allow the customer to use the vehicle while financing is secured, it can put a dealer's license plate on the vehicle. Black suggests that in her solution, no one is misled and it creates a fair and equitable bargaining environment.

Again, we agree with the trial court's rationale. Black's bailment hypothesis is basically no different than the spot delivery agreement and does not appear to be any more efficient or effective. In

both cases, if the financing is not approved, the buyer is required to return the vehicle. Spot delivery agreements serve the purpose of allowing the buyer to begin enjoying his or her new vehicle while waiting for financing approval. Vehicle buyers are not obligated to take the vehicle on a spot delivery agreement, and Black could very well have requested to pick up the van when financing was approved, particularly since she was already worried about her credit history spoiling the purchase. The court stated that spot delivery agreements are a "commonly recognized way to streamline the sales process creating a less burdensome transaction for the buyer and the seller." We are unclear how Black's proposed bailment system would be any less complicated, confusing, or misleading.

Black also argues spot delivery agreements frustrate the public policy set forth in K.S.A. 8-2402. Black contends spot delivery agreements are dishonest and frustrate a stable, efficient, enforceable, and verifiable method for the distribution of vehicles to consumers in Kansas. She cites *Perry v. Goff Motors, Inc.*, 12 Kan. App. 2d 139, 141, 736 P.2d 949 (1987), where the court stated the courts should literally interpret and strictly enforce the statutory provisions to promote the public interests involved in the sale of motor vehicles.

K.S.A. 8-2402 provides in part:

"It is further declared to be the policy of this state to protect the public interest in the purchase and trade of vehicles, so as to insure protection against irresponsible vendors and dishonest or fraudulent sales practices and to assist, provide and secure a stable, efficient, enforceable and verifiable method for the distribution of vehicles to consumers in the state of Kansas and provide a system of tracking the flow of vehicles and their parts as well as preserving supporting services for consumers purchasing or otherwise acquiring vehicles."

The trial court did not erroneously interpret either K.S.A. 2002 Supp. 8-135 or K.S.A. 8-2402. Spot delivery of a vehicle is not unfair, dishonest, or fraudulent per se. The court recognized that some dealers may unfairly or dishonestly use the spot delivery agreement, but that does not mean the system is in and of itself against public policy. Spot delivery does not violate K.S.A. 2002 Supp. 8-135(c)(3) nor is it inconsistent with the public policy concerns of K.S.A. 8-2402.

Last, Black argues Bozarth's use of the spot delivery agreement was unconscionable and the trial court erred in granting summary judgment to the contrary.

The parties disagree on the standard of review for examination of a trial court's determination of the unconscionability of a party's actions. The court in *State ex rel. Stovall v. DVM Enterprises, Inc.*, 275 Kan. 243, 248-49, 62 P.3d 653 (2003), addressed the conflicting precedent on whether our review is either unlimited or deferential to the trial court's discretion:

"Generally, whether an action is unconscionable under the KCPA is a question of law subject to unlimited review. However, the determination of unconscionability ultimately depends upon the facts in a given case. Thus, to a great extent, the determination is left to the sound discretion of the trial court to be determined on the peculiar circumstances of each case."

Judicial discretion is abused only when no reasonable person would take the view adopted by the trial court. *Varney Business Services, Inc. v. Pottroff*, 275 Kan. 20, 44, 59 P.3d 1003 (2002).

Black again raises the issue that the trial court decided disputed facts as a premise for its findings that Black drove the van off the dealership lot knowing the deal was contingent on financing approval. Black argues that if her testimony is believed and she did not know the sale was conditional, then the trial court's holding falls apart because a reasonable person who is told he or she has been approved has no reason to believe he or she would be called upon to return to the dealership to sign another contract at a higher interest rate. Black states that a person who knows the sale is conditional would not be deceived into thinking the sale transaction was completed, would not take the vehicle home and become emotionally attached to it, would not proudly tell his or her friends and show them his or her new vehicle, and would not be in a worse bargaining position than before the transaction. Black states the end result of the spot delivery agreement, or yo-yo deal, is that she was forced into signing a new financing agreement at a higher interest rate or returning the vehicle and admitting to all of her family and friends that she could not be approved for financing because of her bad credit history.

In support of the unconscionable nature of the spot delivery agreement, Black cites *Wille v. Southwestern Bell Tel. Co.*, 219 Kan. 755, 758-59, 549 P.2d 903 (1976), where the court identified 10 factors that should be considered in the determination of whether an act is unconscionable under the KCPA. Black relies on *Wille* factors (3), (5), (6), (8), and (10) in arguing that the spot delivery agreement is unconscionable and the peculiar use of that document in this case was unconscionable:

"(3) a denial of basic rights and remedies to a buyer of consumer goods . . . (5) the circumstances surrounding the execution of the contract . . . (6) the hiding of clauses which are disadvantageous to one party in a mass of fine print trivia or in places which are inconspicuous to the party signing the contract . . . (8) an overall imbalance in the obligations and rights imposed by the bargain . . . (10) inequality of bargaining or economic power. [Citations omitted.]" 219 Kan. at 758-59.

Alternatively, Black relies on the court's discussion of unconscionability in *John Deere Leasing Co. v. Blubaugh*, 636 F. Supp. 1569 (D. Kan. 1986), where the court distinguished between "procedural" and "substantive" unconscionability, while still considering the same factors enumerated by the *Wille* court. Procedural unconscionability occurs through a lack of knowledge and a lack of voluntariness. Substantive unconscionability is found when the terms of the contract are of such an oppressive nature as to be unconscionable. 636 F. Supp. at 1573 (citing *Bank of Indiana, N.A. v. Holyfield*, 476 F. Supp. 104, 109-10 [S.D. Miss. 1979]).

The trial court in this case found the spot delivery agreement to be a contract of adhesion, but not unconscionable. See Restatement (Second) of Contracts § 208, Reporter's Note Comment a (1981) (It is to be emphasized that a contract of adhesion is not unconscionable per se, and that all unconscionable contracts are not contracts of adhesion.). An adhesion contract is a "[s]tandardized contract form offered to consumers of goods and services on essentially 'take it or leave it' basis without affording consumer realistic opportunity to bargain and under such conditions that consumer cannot obtain desired product or services except by acquiescing in form contract." *Anderson v. Union Pacific*

*R.R. Co.,* 14 Kan. App. 2d 342, 346, 790 P.2d 438 (1990) (citing Black's Law Dictionary 38 [5th ed. 1979]). The trial court stated:

"It is clear, with disparity in bargaining power in this case and the 'take it or leave it' nature of the contract forms, that these form contracts are contracts of adhesion. However, because they are contracts of adhesion does not automatically make them unconscionable. The contracts in this case are not unconscionable. The terms of these contracts are not beyond reasonable expectations. Concerning the 'Spot Delivery Agreement,' a reasonable person would assume that a vehicle which they drove off the lot, contingent on financing approval, would have to be returned if the financing was not approved. It would be unreasonable to assume that if financing was not approved the person in possession of the vehicle could keep it with no further obligation to pay. Although the contracts in this case are contracts of adhesion, they are not unconscionable and therefore enforceable."

Several cases from other jurisdictions have rejected arguments similar to those raised by Black in regard to spot delivery agreements.

In *Castellana v. Conyers Toyota,* 200 Ga. App. 161, 407 S.E.2d 64 (1991), Castellana signed virtually the same group of documents as in this case, including a spot delivery form. Castellana denied signing the spot delivery form, insisted that the signature on it was a forgery, and claimed the salesman told her that her credit was approved at the time she drove the car home. After financing fell through, Toyota repossessed the car and Castellana sued for conversion. The court found that numerous documents Castellana read and signed stated, without contradiction, that the credit application had not yet been approved and that the dealership could repossess the vehicle if the application was rejected. The court held the spot delivery form was enforceable, not contrary to public policy, and that Castellana failed to establish any unfair or deceptive practice by Toyota. 200 Ga. App. at 164-66.

In *Dauti v. Hartford Auto Plaza, LTD,* 213 F. Supp. 2d 116 (D. Conn. 2002), a couple leased a used vehicle from Hartford. The couple gave a $3,000 down payment and signed a spot delivery sheet stating the dealership would release the car prior to third-party financing. The couple received a temporary registration, temporary license plate, and car insurance. After the couple's credit was rejected, the dealer notified them that they needed an additional cosigner or to make an additional down payment. After the

couple refused, the dealership repossessed the vehicle. The couple sued the dealership for violations of the Consumer Leasing Act and Connecticut law.

The couple in *Dauti* argued that the dealership engaged in a yo-yo sales transaction designed to deceive them into thinking they had a deal for the purpose of later renegotiating unfavorable terms. The couple confirmed that their signatures were on the delivery sheet, but they had no clear recollection of signing it probably because they were so excited about the car. The *Dauti* court held the spot delivery agreement was enforceable, the couple had a duty to read the delivery sheet before signing it, and there was no contract to lease because the condition precedent was not satisfied. The court stated the couple could not avoid enforcement of the delivery sheet by arguing that they did not review it or receive an executed copy. 213 F. Supp. at 123-24. *Cf. Pescia v. Auburn Ford-Lincoln Mercury Inc.*, 68 F. Supp. 2d 1269, 1287 (M.D. Ala. 1999) (absolutely no disclosure to the buyer that the contract she signed was not final, or that it could be changed at a later date and dealer had a duty to disclose the conditional sale; "based on the facts of cases discussing the issue, it appears that the custom in the industry is to disclose the contingent nature of 'spot financing' or 'spot delivery' contracts. The court has little trouble concluding . . . that [dealer] was required to inform the plaintiffs that the sale of the car to her was not final, was subject to approval [for financing] and that the terms and conditions of the final contract might be different from the contract which she signed. . . . [No] disclosures were made.").

We find the use of the spot delivery agreement in this case was not unconscionable.

Affirmed.