## REYNOLDS v. HAPP, et al.
### Case No. 83-1798-SP11
County Court, Lake County

June 11, 1984

**APPEARANCES OF COUNSEL**

**Richard H. Langley** for plaintiff.

**Richard W. Hennings** for defendant.

**OPINION OF THE COURT**

ROY W. CALDWELL, County Judge.

THIS CAUSE came on for trial without a jury and the Court having heard the testimony of the witnesses and examined the evidence received in this cause makes the following Findings Of Fact, Findings of Law, and enters final judgment herein as follows:

(NOTE: In the following, Plaintiff, Richard R. Reynolds, Trustee, is referred to as "Landlord"; Richard and Clara Spencer are referred to as "Tenant"; Exchange Bank of Clermont is referred to as "Bank"; Darrell L. Happ is referred to as "Defendant".)

*FINDINGS OF FACT*

Landlord owns the Clermont Shopping Center. In 1981, Landlord

leased a store building in the shopping center to Donald Ainbinder, d/b/a Tom's Pizza. Ainbinder sold his interest in the business to Richard and Clara Spencer ("Tenant"). The sale included various items of restaurant equipment ("Equipment"). One item of equipment is an "Armstrong air conditioner". Spencer financed the purchase of the Equipment with a loan from the EXchange Bank of Clermont ("Bank"). To secure the loan, Tenant gave Bank a Promissory Note and security interest in all of the Equipment, including the Armstrong air conditioner. The security interest is evidenced by a Security Agreement with an after-acquired property clause. Simultaneously, Landlord executed in favor of the Bank a Landlord's Waiver of Lien.

In June, 1983, Tenant complained to the Landlord that the air conditioner was not cooling properly. The Tenant's building was cooled in part by an Armstrong condenser located on top of the roof of the shopping center. Landlord requested Tom Duncan Air Conditioning ("Duncan") to fix the air conditioner. Duncan found the condensing coils on the Armstrong unit were faulty. Rather than repairing the condenser, Duncan removed the Armstrong unit and installed a new Bard Condensing Unit in its place. An invoice in the amount of $920.70 was sent to the Landlord. Landlord complained about the excessive repair bill. Duncan explained that the old condenser was not worth repairing and that he installed a new condenser in its place. Landlord accepted this explanation and gave Duncan a check to pay for the new unit. The Armstrong unit is currently in the possession of Duncan.

At about this same time, Landlord was experiencing problems with the Tenant. The Tenant was behind on his rent. A short time thereafter, Tenant abandoned the lease and left the Equipment on the premises to be disposed of by the Bank. A few days later, Defendant expressed an interest in leasing the premises. Landlord and Defendant attempted to negotiate a new lease of the premises. Defendant talked with the Bank about purchasing the Equipment. Landlord assisted both Defendant and the Bank by soliciting bids on the equipment from various third parties. After more than two months of negotiation, Defendant purchased the Equipment from the Bank for $3,000.00. Bank gave Defendant a bill of sale. The bill of sale describes the same Equipment listed in the Security Agreement, including the Armstrong Air Conditioner. On the date of sale, Landlord and Defendant were still attempting to work out the terms of a lease.

In October, 1983, Defendant told Landlord that he did not want to sign a lease. Landlord instructed Defendant to remove his Equipment from the premises so he could look for a new tenant. Tenant was given

125

a key to the building. Several days later, Defendant removed all but a few items of Equipment from the building. Landlord made several telephone calls to get Defendant to remove the rest of the property. Defendant made a second trip to the store. He took everything he wanted, leaving a few items such as a sink, grease trap, and the Armstrong air handler.

Landlord eventually found a Chinese restaurant to lease the premises. While in the process of renovating the premises for the new tenant, Landlord hired Kennedy to service the air conditioning system. The Armstrong air handler could not be repaired so Kennedy installed a new air handler to use in conjunction with the new condensing unit installed by Duncan. When Kennedy tested the new air handler, he discovered that the system would not turn on. He went on top of the building only to find that the condensing unit was missing. Kennedy immediately contacted the Landlord, who called Duncan to inquire about the missing condenser. Duncan said that at Defendant's instruction he removed the condenser from the roof and took it to Defendant's place of business. At no time did either Defendant or Duncan notify Landlord that they were taking it.

## FINDINGS OF LAW

On October 30, 1981, Tenant borrowed $18,456.00 from the Bank. The loan is evidenced by a promissory note and Security Agreement. A "security agreement" under the Commercial Code means an agreement which creates or provides for a security interest—F.S. 679.105(1)(1). The Security Agreement in the instant case is signed by the Tenant and the Bank. The Tenant is the "debtor" or the person who owes payment of the obligation secured—F.S. 679.105(1)(d). The Bank is the "secured party" or the lender in whose favor there is a security interest—F.S. 679.105(1)(m).

Florida Statute 679.203(1) governs the formal requisites for the enforceability of a security interest. That statute provides in pertinent part:

". . . a security interest is not enforceable against the debtor or third parties with respect to the collateral and does not attach unless:

(a) . . . the debtor has signed a security agreement . . . and,

(b) Value has been given; and

(c) The debtor has rights in the collateral.

A security interest does not attach to collateral until all of the events specified in 679.203(1) have taken place—F.S. 679.203(2). Most contro-

versies concerning the enforceability of a security interest center on the question of whether the debtor has "rights in the collateral."

Defendant claims that the Bank acquired title to the disputed property when it foreclosed on the Equipment which the Bank held as security for the loan. This is true only if the Tenant had "rights" in the property within the meaning of Section 679.203(1)(c). If the Tenant has no "rights in the collateral," then the Bank's security interest cannot attach to the property. A security interest that does not attach is unenforceable against the interests of third parties.

The term "rights in collateral" as used in the Uniform Commercial Code does not have a clear definition. *K.N.C. Wholesale, Inc. v. AWMCO, Inc.,* 127 Cal. Rptr. 208 (1st Ct. App. 1976). However, it is apparent that the rights of creditors stem from the debtor's obtaining rights in the collateral. The rights of creditors are no greater than the rights of the debtor—*Stowers v. Mahon,* 510 F.2d 139 (5th Cir. 1975). Ordinarily, "rights in the collateral" means that the debtor owns the collateral. The Code recognizes that a debtor who does not own collateral may nevertheless use the collateral for security, thereby obtaining "rights in the collateral" when authorized to do so by the actual owner of the collateral. *K.N.C.,* supra, at p. 210.

A lender cannot enforce its security interest against property that is titled in the name of a third party. In *Gicinto v. Credithrift of America,* 549 P.2d 870 (Kan. 1976), Gicinto, a used car dealer, filed a replevin action against Credithrift, a loan company, to recover three automobiles. The automobiles were purchased from Gicinto by James Norman. Norman paid for the cars by a check that was later dishonored. Gicinto attempted to recover the cars only to find that Norman had sold them to customers who financed their purchase with Credithrift. Each customer gave Credithrift a note and a security agreement naming the automobiles as collateral. Subsequently, each buyer defaulted on his loan and Credithrift repossessed the cars. Gicinto demanded the cars from Credithrift. Credithrift claimed that it was entitled to possession because of its security interest. In ruling against Credithrift, the Kansas Supreme Court held:

"That no title to the [automobile] passed to James Norman . . . . . . [Credithrift's] rights are based upon the title of James Norman. James Norman having never obtained title and having no right to the vehicles, [Credithrift] had no right to the possession of said vehicles and could not perfect a lien on said vehicles." Id. at p. 872.

". . . Credithrift couldn't acquire a security interest in any of the

127

cars since the [Commercial Code] requires the debtor to acquire an interest in the collateral before a security interest could attach. The security interest was thus unenforceable even as between the signatories. Id. at 873.

The car buyer in Gicinto signed a security agreement giving the lender a security interest in collateral. Credithrift's security interest did not attach because the debtor did not have title to the automobile. The debtor did not have sufficient "rights in the collateral" to enable the lender to enforce its security interest against the true owner. Similarly, in the instant case, title to the Bard Condenser is in the Landlord. Duncan gave a bill of sale to the Landlord and the Landlord paid full value for the property. The Tenant did not have "rights in the collateral". Therefore, the security interest of the Bank could not attach to the property and the bank could not assert any enforceable rights against the Landlord's interest in the property.

At trial, Defendants argued that the Bank could foreclose against the property because of the after-acquired property clause in the Security Agreement. An after-acquired property clause does not alter the Commercial Code requirement that the debtor have "rights in the collateral". The debtor must have "rights" in the after-acquired property for the security interest to attach. *First Nat'l Bank & Trust Co. of Norman, Okla. v. Jim Payne Pontiac,* 20 UCC Rep. Serv. 768 (Okla. Ct. App. 1976) considers the effect of an after-acquired property clause on a secured party's suit against a third party owner. First National attempted to replevin automobiles in the possession of Defendant, Payne Pontiac. Earlier, Peerson, a used car dealer, purchased three cars for Payne. The cars were paid for by Payne. However, instead of delivering the cars to Payne, Peerson placed them on his own car lot. Peerson was already indebted to First National, which claimed a security interest in "inventory of all automobiles now owned or hereafter acquired by Peerson." Later, Peerson delivered the cars to Payne. Peerson defaulted under its security agreement. First National initiated a replevin action against Payne to recover the vehicles on the ground that the bank's security interest was superior to any ownership interest of Payne. In rejecting First National's claim, the Court held:

"The Uniform Commercial Code's provision pertaining to 'after-acquired property' and 'when security interest attaches' . . ." reads in part as follows:

(1) A security interest cannot attach until there is agreement that it attach and value is given and the debtor has rights in collateral . . . Id. at p. 772.

"Thus for the Bank to prevail the security interest must have attached. The security interest does not attach . . . until . . . the debtor has rights in the collateral and therefore the security interest did not attach. Id. at p. 773.

"The only way Bank could assert an interest in the three Fords would be by finding the cars to be the after-acquired property of Peerson. The record clearly indicates that the vehicles were not purchased by Peerson, but by Payne, and that Peerson had no interest in the automobiles to the extent they could be considered after-acquired property within the security agreements between Peerson and the Bank. Id."

In a similar case, *National Lifestock Credit Corporation v. First State Bank of Harrah*, 503 P.2d 1283 (Okla. Ct. App. 1972), the Court held that an after-acquired property clause did not give a secured party an enforceable interest against the true owner of the property. In this case, Rowlett, a cattle buyer, purchased 150 head of cattle as the agent of Floyd Oxford. The cattle were put in the feed lots owned by Rowlett. Oxford paid Rowlett $17,432.45 for the cattle. Earlier, National loaned Rowlett money. Rowlett executed promissory notes, security agreements, and financing statements in favor of Plaintiff. The security agreements contained an after-acquired property which covered:

"All property . . . which at any time may hereafter be acquired by the debtor, including but not limited to: All natural increase, additions, accretions and replacements of livestock . . . . Id. at p. 1284.

Rowlett defaulted on his loans to National. National filed suit against Oxford to replevy the 150 cattle on the grounds that the after-acquired property clause in the security agreements gave National a prior security interest in the cattle. Oxford defended on the grounds that he was the owner of the cattle and that the security interest could not attach to his separate property. The Court ruled in favor of Oxford saying:

"[Oxford's] position on the other hand is to the effect that a perfected security agreement with an after-acquired clause 'does not attach to property in which the debtor has no interest.' We must agree . . . A security interest cannot attach until . . . the debtor has rights in the collateral . . . The only way National could assert an interest in the 150 head of cattle would be by finding that cattle were Rowlett's after-acquired property. . . . Rowlett purchased the cattle for Oxford, not himself, thus the cattle would not be subject to the

**129**

provisions of National's security agreement with Rowlett, which contained the after-acquired property clause. The law quoted by National is all correct, but has no application to the present set of facts, unless Rowlett purchased the cattle for himself rather than Oxford . . . the record clearly contains sufficient evidence to support the judgment of the trial court in finding Rowlett purchased for Oxford and not himself . . . Id. at p. 1285.

The weight of the evidence in this cause fails to establish that the Tenant had any rights in the Bard Condensing Unit.

Therefore, the Bank had no right under its Security Agreement that empowered it to convey any interest to the Defendant in the Bard Condensing Unit.

The Landlord, having bought and paid for the Bard Condensing Unit as shown by the evidence, is the owner of same, free of any claims of the Bank or its transferee, the Defendant, and is entitled to possession of the Bard Condensing Unit, or its value in the amount of $920.70.

## OTHER ISSUES

Other issues raised by the pleadings were the issue of punitive damages sought by the Plaintiff against the Defendant; attorney's fees for the Plaintiff's attorney under Chapter 57 of the Florida Statutes; and the issue of damages raised by the counterclaim of Defendant.

Upon consideration of the issue of punitive damages, the Court finds from the evidence that neither the Defendant nor the Plaintiff acted maliciously or with such wantonness in the removal of the Bard Condensing Unit as to warrant punitive, or exemplary damages.

As to Plaintiff's and Defendant's claims for attorney's fees under Chapter 57.105 of Florida Statutes, the evidence convinces me that the right to the Bard Condensing Unit could well have been covered by terms of the Bank's Security Agreement regarding "Replacements" until evidence to refute that right was produced at trial.

As to Defendant's Counterclaim seeking goods alleged to be covered by the Bank's Security Agreement and Bill of Sale, the evidence establishes that the Bard Condenser is owned by the Plaintiff. A more specific description of said Condenser is as follows:—

1—ECQ 36 Condensing Unit (Bard)
    S/N E83306983

1—¾ Suction Line Drier

1—⅜ Liquid Line Drier

Evidence further establishes that the remaining goods left in Landlord's building by the Defendant were abandoned to the Landlord and that the other allegations of Defendant's Amended Counterclaim are unsupported by convincing evidence.

## PARTY DEFENDANT ADDED

Prior to trial of this cause, it was stipulated by the attorneys for Plaintiff and Defendant that Clarence Cornell a/k/a Clancey Cornell should become a party defendant in the Amended Complaint and that the answer filed by the Defendant, Darrell L. Happ, should also be the answer of Cornell. Further, service of process on Clarence Cornell was waived and Cornell voluntarily submitted to the jurisdiction of the Court.

It is therefore, upon consideration, ORDERED and AD-JUDGED:—

1. That the Plaintiff recover from the Defendants, Darrell L. Happ and Clarence Cornell a/k/a Clancey Cornell, jointly and severally, the amount of $920.70 as damages for the value of the Bard Condenser Unit at time of removal or, in the alternative, that a Writ of Replevin issue to recover possession of same, together with costs of this action in the amount of $524.31 for which let execution issue.

2. That neither the Plaintiff nor the Defendant are entitled to punitive or exemplary damages.

3. That neither the Plaintiff nor the Defendant are entitled to attorney's fees under Chapter 57.105 of Florida Statutes.

4. That the Defendant take nothing by his Counterclaim.

5. In the event the Plaintiff elects to recover possession of the property by a Writ of Replevin pursuant to Chapter 78 of Florida Statutes from the Defendant, Darrell L. Happ, that such property is described as follows:—

1—ECQ 36 Condensing Unit (Bard)
S/N E83306983

1—¾ Suction Line Drier